HENDERSON COUNTY DRAINAGE DISTRICT NO. 3, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 97–821 L.

United States Court of Federal Claims.

Jan. 23, 2003.

Eric P. Bock, Washington, DC, for plaintiff. Michael C. Formica, Washington, DC, of counsel.

Scott H. Park, with whom was Thomas L. Sansonetti, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant. Lisa Donis, Civil Division, United States Department of Justice, Washington, DC, and Rian Hancks, United States Army Corps of Engineers, Office of Counsel, Rock Island District, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This action involves claims on theories of breach of contract and takings brought by drainage districts and riparian landowners along the Upper Mississippi River in Illinois and Missouri against the United States Army Corps of Engineers (Corps) arising out of the Corps' operation and maintenance of a 9–foot navigation channel (Navigation Project or 9–foot channel).[1]

Constructed in the mid–1930s, the Navigation Project permits commercial vessels to move cargo. *Henderson County Drainage Dist. No. 3 v. United States*, 53 Fed.Cl. 48, 51 (2002). To support commercial river traffic, the Corps maintains a minimum 9–foot channel depth along the length of the Upper Mississippi River using various locks and dams to control a series of pool levels. *Id.* From the late 1930s until the 1950s, the United States made annual payments to fifteen drainage districts for additional pumping costs incurred by the drainage districts due to the high river stages caused by the Navigation Project. *Id.* In a 1955 report to Congress, the Secretary of the Army recommended rectification payments to each affected drainage district. *Id.* Congress, in response, authorized payments to the drainage districts in exchange for releases waiving future claims arising out of the operation and maintenance of the Navigation Project. *Id.* In 1961, various drainage districts executed releases.[2] *Id.* In 1995, plaintiff filed suit.

On cross-motions for summary judgment, the court found, in its Opinion and Order

1. A full recitation of the facts is set out in *Henderson County Drainage Dist. No. 3 v. United States*, 53 Fed.Cl. 48 (2002).

2. The releases state:

WHEREAS, The Congress of the United States, by an Act approved July 3, 1958 ... has authorized the rectification of damages to certain levee and drainage districts caused by the execution of a project on the Mississippi River ... to provide a navigation channel nine feet deep and of adequate width for navigation by the construction of twenty-six locks and dams of low heads supplemented by channel dredging (hereinafter referred to as "the nine-foot channel project"), and

WHEREAS, The Act approved July 3, 1958 provides that said rectification of damages shall be undertaken in accordance with the plans and subject to the conditions in House Document Numbered 135, Eighty-fourth Congress, First Session, and

WHEREAS, the said House Document Numbered 135 provides that a payment of [sum certain] may be made to [the particular drainage district] in full settlement for all damages heretofore or hereafter sustained by said district from the execution of the nine-foot channel project, upon presentation of such evidence, certificates, receipts, releases, and assurances as the Chief of Engineers may consider reasonable and necessary, and

WHEREAS, The Congress has appropriated Federal funds for said payment;

NOW THEREFORE, in consideration of the sum [certain] in hand paid by the United States, receipt of which is hereby acknowledged, [the particular drainage district] does hereby release and forever discharge the United States ... from any and all damages and claims for damages, past, present, and future, that said district may have or claim to have, arising out of, resulting from, or caused by the execution, construction, operation, or maintenance of the nine-foot channel project except for the final annual payment for increased pumping costs for the calendar year 1960.

IN WITNESS WHEREOF, we, the Commissioners of [the particular drainage district] have hereunto subscribed our names for and on behalf of said district this ... day of ... 1961.

53 Fed.Cl. at 53.

dated July 30, 2002 (Opinion), that plaintiffs' contract claims were time-barred. *Henderson County*, 53 Fed.Cl. at 58. The court interpreted the releases as imposing a limited duty on the United States—to pay money—in consideration for a comprehensive release from claims for damages arising out of the operation or maintenance of the Navigation Project. By separate Order dated July 30, 2002, the court directed the parties to show cause why plaintiffs' takings claims, which were also alleged to have derived from the operation and maintenance of the Navigation Project, were not similarly precluded by the terms of the executed releases. *See* Order of July 30, 2002.

Plaintiffs seek reconsideration of the court's Opinion, arguing that summary judgment on both the merits of their contract claims and the timeliness of those claims was improper. Plaintiffs' Motion for Reconsideration (Pls.' Recons. Mot.) at 7. In response to the court's Show Cause Order, plaintiffs argue that the releases do not preclude them from asserting their takings claims because the damage to their property was not caused by the Navigation Project that was the subject of the releases. Plaintiffs' Response to the July 30, 2002 Order to Show Cause (Pls.' Show Cause Resp.) at 2.

Now before the court are Plaintiffs' Motion for Reconsideration and Plaintiffs' Response to the July 30, 2002 Order to Show Cause and the responsive briefing thereto.[3]

## I. Whether Plaintiffs are Entitled to Reconsideration

▆▆▆ Rule 59 of the Rules of the Court of Federal Claims (RCFC) addresses motions for reconsideration:

[R]econsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States. On mo-

tion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

RCFC 59(a)(1) (2002). The decision to grant a motion for reconsideration lies within the sound discretion of the court. *Yuba Natural Res., Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir.1990). The court must consider such motion with "exceptional care." *Fru–Con Constr. Corp. v. United States*, 44 Fed.Cl. 298, 300 (1999). To prevail on a motion for reconsideration, the movant must point to a manifest error of law or mistake of fact. *Franconia Assocs. v. United States*, 44 Fed.Cl. 315, 316 (1999). The movant does not persuade the court to grant such motion by merely reasserting arguments which were previously made and were carefully considered by the court. *Principal Mut. Life Ins. Co. v. United States*, 29 Fed.Cl. 157, 164 (1993). A motion for reconsideration "is not intended to give an unhappy litigant an additional chance to sway the court." *Fru–Con Constr. Corp. v. United States*, 44 Fed.Cl. at 300 (quoting *Bishop v. United States*, 26 Cl.Ct. 281, 286 (1992)). Rather, the movant must show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. *Id.* at 301.

Here, plaintiffs seek reconsideration of the court's Opinion on two grounds. First, plaintiffs argue that the court did not properly interpret the "whereas" clauses contained in the releases executed in 1961. Pls.' Recons. Mot. at 1. Plaintiffs also argue that the court improperly relied on the deposition testimony of Mr. Thomas Crane who, as counsel for the Army Corps of Engineers, drafted the releases. *Id.* at 5–7.

### A. The "Whereas" Clauses

▆▆ Plaintiffs argue that the operative contract language that releases the United

---

**3.** The responsive briefing includes: (1), Defendant's Response to Plaintiffs' Supplemental Brief Under the July 30, 2002 Order to Show Cause (Def.'s Show Cause Resp.), (2) Defendant's Opposition to Plaintiffs' Motion for Reconsideration (Def.'s Recons. Opp.), and (3) Plaintiffs' Consoli-

dated Reply to Defendant's Opposition to Plaintiffs' Motion for Reconsideration and Defendant's Response to Plaintiffs' Supplemental Brief Under the July 30, 2002 Order to Show Cause (Pls.' Consol. Reply).

States, in consideration for the payment of certain monies to the drainage districts, "from any and all damages and claims for damages ... caused by the execution, construction, operation, and maintenance of the nine-foot channel project" is ambiguous. *Id.* at 2. Plaintiffs assert that the terms "damages", "operation", "maintenance", and "nine-foot channel project" are undefined on their face and require reference to the "whereas" clauses to determine what the parties intended the terms to mean. *Id.* at 2, 4. Plaintiffs contend that "[t]he Release[s], when fairly construed in their entirety, clearly place[ ] an affirmative contractual duty on the defendant Corps to rectify damages caused by the nine-foot channel project 'in accordance with the plans and subject to the conditions' in House Document Number 135." *Id.* at 4. But, because the parties here "continue to disagree as to what those 'plans' and 'conditions' are," plaintiffs argue that summary judgment was improper. *Id.*

Plaintiffs' arguments about the "whereas" clauses are merely reassertions of the arguments previously made and considered by the court in its decision on the parties' cross-motions for summary judgment. *See Principal Mut. Life Ins.*, 29 Fed.Cl. at 164. In its Opinion, the court expressly addressed the "whereas" clauses in interpreting the releases. *See* 53 Fed.Cl. at 53–56. Plaintiffs have not met the requirements for reconsideration on this issue by failing to show: (1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice. *See Fru-Con Constr. Corp.*, 44 Fed.Cl. at 300. Plaintiffs' arguments about the court's interpretation of the "whereas" clauses do not support reconsideration of the Opinion.

### B. Mr. Crane's Deposition Testimony

Plaintiffs also argue that the court's reliance on Mr. Crane's testimony is misplaced because "what Mr. Crane intended in drafting the Releases is irrelevant since he was simply the scribe who was given the ministerial duty to draft a Release on behalf of the Chief Engineer and Secretary of the Army consistent with language contained in the 1958 Act and House Document 135." Pls.' Recons. Mot. at 6. Plaintiffs, however, acknowledge that Mr. Crane, "acting within the scope of his office as an attorney within the Corps Rock Island Office of District Counsel, as delegate of the Chief Engineer," *id.* at 5, was an authorized agent "to bind the United States to those contractual obligations that the Secretary of the Army and Chief Engineer had agreed to undertake as authorized by Congress." *Id.*

The Federal Circuit has stated that " 'any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government.' " *Massie v. United States*, 166 F.3d 1184, 1188 (Fed.Cir.1999)(quoting *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1326 (Fed.Cir.1997)).

■ "It is well established that the government is not bound by the acts of its agents beyond the scope of their actual authority." *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir.1998) (citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). But actual authority may be implied when the necessary authority is considered to be an "integral part of the duties" of the particular government employee. *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed.Cir.1989). A detailed inquiry into the precise nature of the employee's duties is appropriate to determine whether implied actual authority exists. *See Zoubi v. United States*, 25 Cl.Ct. 581, 587 (1992). In addition, an agreement made by a government agent without authority can be subsequently ratified by an agent with express or implied actual authority if the ratifying official has actual or constructive knowledge of the unauthorized act. *Harbert/Lummus*, 142 F.3d at 1433 (citing *United States v. Beebe*, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901)); *Dolmatch Group, Ltd. v. United States*, 40 Fed.Cl. 431, 438 (1998).

■ Mr. Crane testified at deposition that, when he was hired as assistant district counsel to work in the Corps's Rock Island Office in 1959, he became the second attorney in the office and worked as the assistant to the chief counsel of that office, Mr. Carlton Kelly. *See* Exhibit 1 to Plaintiffs' Motion for Reconsideration (Pls.' Recons. Mot. Ex.) at 5. Mr. Crane estimated that twenty percent of his work in the legal branch involved contract drafting and explained that he did not "do the actual face to face negotiations with Congress and outside interests" but that he did "review the provisions of statutes and the backup of Congressional documents using the ordinary principles of interpretation."[4] *Id.* at 9. Mr. Crane specifically stated that he "reviewed House Document 135 involved in this case." *Id.* at 10.

While acknowledging that he did not review the legislative history surrounding the enactment of the July 3rd 1958 Act (which provides "that the rectification of damages shall be in accordance with the plans and subject to the conditions in House Document 135, 84th Congress, first session," *id.* at 56–57), Mr. Crane testified about his understanding of the phrase "in accordance with":

> In accordance with the plans. Well, the rectification shall be undertaken in accordance with the plans.
>
> Well, the plans are, consist of numerous tables which include money amounts to be paid to the drainage districts in exchange for releases or other documents as the chief of engineers may consider reasonable and necessary. And basically that's kind of it referring to the rectification. It's the table of amounts and so forth.

*Id.* at 57. He testified that his understanding of the phrase was based on the "plain meaning of the words," *id.* at 58, and that the intent of the contractual undertaking was to secure a release of all claims from the signa-

tory in consideration for the payment of a sum of money. *Id.* at 79.

It is undisputed that Mr. Crane worked as an attorney within the Corps' Rock Island Office of District Counsel and as a delegate of the Chief Engineer at the time he drafted the 1961 releases. Because drafting contracts was an "integral part of the duties" of Mr. Crane's position, *see H. Landau & Co.*, 886 F.2d at 324, Mr. Crane's preparation of the 1961 releases was squarely within the scope of his work responsibilities. The court is satisfied that Mr. Crane was "a Government representative who had actual authority to bind the Government," *Massie*, 166 F.3d at 1188, and that his understanding of the releases that he drafted is relevant testimony which the court was properly entitled to consider in its Opinion. Plaintiffs' arguments concerning the court's reliance on Mr. Crane's testimony do not support reconsideration of the Opinion.

For the foregoing reasons, Plaintiffs' Motion for Reconsideration is DENIED.

## II. Whether Plaintiffs May Pursue Their Takings Claim

In their response to the court's July 30, 2002 Order to Show Cause, plaintiffs assert that the executed releases do not preclude their takings claims because the damage the government caused to their property was beyond the scope of the 9–foot channel that was the subject of the releases. Pls.' Show Cause Resp. at 2. Plaintiffs argue, "[T]o the extent property of the plaintiff drainage districts has been taken by the United States as a result of actions by the Corps which are inconsistent with those specific physical and operational characteristics, the damages would not be caused by the nine-foot channel project.... Accordingly, the Releases do not preclude the drainage districts from bringing the takings claims against the United States which they have raised in this litigation."[5] Pls.' Show Cause Resp. at 2.

---

**4.** Mr. Crane stated that "communicating with Congress because that was a high level activity ... would have been done, if at all, by my boss [Mr. Kelly]." Pls.' Recons Mot. Ex. at 9. With respect to Mr. Kelly's communications with Congress on the matter involved in this particular case, Mr. Crane stated that "[m]ost of the communications with Congress would have been

done by the office of the chief of engineers in Washington, and Mr. Kelly's communications would have generally been with the headquarters of the Corps of engineers in Washington or with the division commander who was at the time ... in St. Louis ...." *Id.* at 10–11.

**5.** Plaintiffs further argue that, because the individual landowner plaintiffs never signed the re-

Plaintiffs contend that they are not precluded from asserting their claims for damages because the Corps is "clearly not operating within the nine foot channel project as defined in the Congressional [documents]." *Id.* at 5. In support of their position, plaintiffs rely on the testimony of Mr. Crane that "if the [nine-foot channel] project were significantly changed so that it would ... cause additional damages not considered in this release ... it would be a different project." *Id.*

In their Corrected Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgement (Pls.' Mem.), plaintiffs allege that policy changes by the Corps with respect to the operation and maintenance of the 9–foot channel since the execution of the releases in 1961 have effected a taking of plaintiffs' property. Pls.' Mem. at 4. *See also* Corrected Second Amended Complaint (Corr.Compl.) ¶¶ 162, 175. In particular, plaintiffs state:

> After the execution of the Release in 1961, the Corps repeatedly stated that strengthening of the [Henderson County Drainage District No. 3] levee was under continued study. In 1977, the Corps and [Henderson County Drainage District No. 3] began to jointly explore whether the [Henderson County Drainage District No. 3] levee could be strengthened under the flood control authority contained in PL 84–99 [the flood control emergency authority set forth in Public Law 84–99, *see* Pl.'s Mem. at 7]. However, by 1981, the Corps had removed [Henderson County Drainage District No. 3] from the Pl 84–99 program because of the inability of [Henderson County Drainage District No. 3] to afford to repair erosion and take other maintenance measures on its levee. During the 1980's, the Corps began to formulate a policy that repair of erosion on district flood control levees was the sole responsibility of the drainage districts. By 1989, it denied that any of the erosion on the main stem levees

of [Henderson County Drainage District No. 3] and other drainage districts was caused by the Navigation Project. In 1993, Plaintiff John Robb [an individual landowner plaintiff in this lawsuit] began to press the Corps on its commitment to maintain levees, such as the [Henderson County Drainage District No. 3] levee, as part of its maintenance of the Navigation Project. At the same time, the Corps took the position that the [Henderson County Drainage District No. 3] main stem levee was not necessary to maintain Pool 18 and that, therefore, erosion caused by the Navigation Project which threatened the levee's integrity was not the responsibility of the Corps. Because of additional pressure created by Mr. Robb, the Corps eventually declared that it had a flowage easement and therefore was not required to maintain the levee. This declaration prompted the filing of this action by the Plaintiffs in 1995.

Pls'. Mem at 27–28. Plaintiffs explain that "[a]s a result of discovery undertaken pursuant to this action, the Plaintiffs discovered that the Corps had been responsible for increased costs of pumping and levee maintenance incurred by the districts by its raising of river stages in the navigation pools." *Id.* at 28. Plaintiffs argue that the Corps' appropriation for public use of their property through erosion and other damages to the district levees "did not become clear and remained uncertain, and [their] takings claim did not accrue, until the Corps asserted in 1993 that a flowage easement, obtained by virtue of the executed release, allowed [the Corps] to damage the [Henderson County Drainage District No. 3] main stem levee by using it to contain Pool 18." *Id.* at 27. Analogizing the Corps' shifting and uncertain policy on levee maintenance here to the Corps' policy on beach erosion in *Applegate v. United States*, 25 F.3d 1579 (Fed.Cir.1994), plaintiffs assert that their takings claim could not

---

leases, they are not precluded from raising such claims against the United States. Pls.' Show Cause Resp. at 1. If the releases were a bar to plaintiffs' takings claim, the court believes the plaintiff landowners would be barred even though they did not sign the releases. The court

considered whether the landowners were bound by the releases in its Opinion, and concluded that they were parties under the third party beneficiary doctrine. *See Henderson County*, 53 Fed.Cl. at 52.

have accrued until 1993 when the Corps asserted a flowage easement. *See id.* at 27–28.

Defendant does not dispute the Corps' assertion of a flowage easement but rather argues that "[t]he ongoing correspondence between the United States and local landowners and officials concerning erosion and other impacts also demonstrates that the plaintiff landowners knew of the alleged takings for many decades prior to the filing of this suit." Defendant's Response to Plaintiffs' Supplemental Brief Under the July 30, 2002 Order to Show Cause (Def.'s Show Cause Resp.) at 4–5. Defendant asserts that plaintiffs' takings claims are untimely. *Id.* at 5.

■ The Federal Circuit, however, recently stated:

> Generally, claims against the government must be filed "within six years after such claim first accrues." 28 U.S.C. § 2501 (2000). The accrual of a takings claim where the government leaves the taking of property to a gradual physical process occurs when the situation has "stabilized." *See Boling v. United States,* 220 F.3d 1365, 1370 (Fed.Cir.2000). "[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined." *Id.* at 1370–71.
>
> . . . .
>
> This court has noted that the "critical element that delayed stabilization in *Applegate* [is] the justifiable uncertainty about the permanency of the taking." [*Boling,* 220 F.3d at 1372.] We have further explained that "a claim stabilizes when the 'permanent nature' of the taking is evident." [*Boling,* 220 F.3d at 1372] (citing *Fallini v. United States,* 56 F.3d 1378, 1382 (Fed.Cir.1995)). Applying these principles to the present case, the question is whether the "predictability [and permanence] of the extent of damage to the [plaintiffs'] land" was made justifiably uncertain by the Corps' mitigation efforts. *Applegate,* 25 F.3d at 1583.

*Banks v. United States,* 314 F.3d 1304, 1307–10 (Fed.Cir.2003).

■ Applying the Federal Circuit's reasoning in *Banks* to the facts in this case, the court believes that genuine issues of material fact exist as to whether the " 'predictability [and permanence] of the extent of damage to the [plaintiffs'] land' was made justifiably uncertain" by the Corps' shifting policy on levee maintenance. Here, after many years of negotiating about and denying responsibility for maintenance of the drainage districts' levees, the Corps stated in 1993, apparently for the first time, that it had established a flowage easement at the main stem levee of Henderson County Drainage District No. 3 when it obtained the 1961 release. Plaintiffs' Exhibit 22 (Letter dated August 30, 1994 from Stanley G. Genega, Major General of U.S. Army, Director of Civil Works, to John Robb of Henderson County Drainage District No. 3). Plaintiffs may be shown in further proceedings to have been "justifiably uncertain" with respect to their takings claim until the Corps asserted a flowage easement in 1993.

■ In addition, the record indicates that the Corps was aware of the government's obligation under the Fifth Amendment to pay "just compensation" to plaintiffs for property taken for public use, but did not address that obligation in the releases. Of particular interest is the 1954 exchange of correspondence between the Corps' Chief of Engineers and the Director of Iowa's Natural Resources Council addressing the proposed method of compensating the drainage districts for damages to the drainage districts and their levees. *See* Parties' Joint Appendix of Evidence in Support of Cross–Motions for Summary Judgment (Jt.App.) at 116–19. Upon review of the Corps' report detailing its engineering studies and recommendations for compensation to the drainage districts, the Director of Iowa's Natural Resources Council observed in a letter dated June 16, 1954 to the Chief Engineer of the United States Army Corps of Engineers:

> The subject report recommends that the ... resulting lump-sum payment be made to the drainage districts as final and complete settlement. . . .

A lump-sum settlement ... forbids the possibility of taking advantage of any technical advance or material change in land use or occupancy that might occur. For example, definite projects are at this time under consideration by the Government for the construction of more adequate flood-control levees for the areas in question. It might be more prudent to maintain annual payments until final decisions have been made with reference to those projects.

. . . .

The major items of payment recommended are increased pumping costs and depreciation to the physical plant. The Federal share of operation cost is based on the actual volume of additional water pumped, whereas the Federal share of depreciation is based on theoretical rather than factual conditions.... *[T]he depreciation allowances so recommended are not acceptable to many of the districts.*

. . . .

*The subject report recommends—*

that the authority for provisions of remedial works or land acquisitions as contained in Rivers and Harbors (sic) Act, approved March 2, 1945, be terminated upon authorization and *provision for payment of the lump sum settlement recommended.*

*However, the report also indicates that certain recurring conditions may require future remedial action, and makes specific reference to problems of siltation.* The report suggests that these future remedial needs can be accomplished under existing authority, although the nature and extent of this authority is not definitely stated. *We believe that any restriction of the authority granted in the Rivers and Harbors (sic) Act of March 2, 1945, should not revoke the authority to undertake remedial action required by any future conditions, recurring or otherwise, which result*

*from the operation of the navigation project and for which annual or lump-sum settlement has not been provided.*

Jt.App. at 117–18 (emphases added).

In a letter to the Director of Iowa's Natural Resources Council dated November 30, 1954, the Corps' Chief of Engineers responded:

I note that you conclude that the engineering studies performed in compiling the report are reasonable and accurate.... With respect to your comment concerning depreciation allowances, I feel that *the method* employed is reasonable in view of the obsolescence factor and that it *yields a just compensation to the districts.*

Your letter suggests that the remedial-work authority should not be revoked in the event provision for annual payments is adopted. *Our studies show [however] that the recurring conditions that may require future remedial measures can be carried on under existing authorities* and would not require the authority contained in the River and Harbor Act of March 2, 1945.[6] With respect to your views that annual payments be continued until such time as the effect of the authorized levee modification can be determined, studies made indicate that seepage from pool operation will not be reduced to any significant degree because most of the seepage passes through the foundation medium [of the levees] consisting of deep sands.

Jt.App. at 119 (emphases added).

While the Corps' Chief of Engineers opined that the payments for the releases were "just compensation," that concept does not appear in the releases. *See Henderson County*, 53 Fed.Cl. at 53. Also inconsistent with the concept of a taking is the Corps' acknowledgment of a possible need for "future remedial measures" and of the Corps' intention to address that need "under existing authorities."[7] *See id.*

---

**6.** The River and Harbor Act of March 2, 1945, authorized funds for use by the Secretary of the Army "for protecting, clearing, and straightening channels in navigable [waters] ... when in the opinion of the Chief of Engineers such work is advisable in the interest of navigation or flood control." 33 U.S.C. § 603a (2001).

**7.** The parties sharply dispute the identity of the "existing authorities" referred to in House Document 135. Plaintiffs assert that under the Navigation Project authority contained in the 1958 River and Harbor Act, the Corps must maintain those levees that are necessary to maintain the Navigation Project. *See* Pls.' Mem. at 11–12; *see*

Several cases shed light on the question of when a release may be interpreted to preclude the later assertion of a takings claim. In *Bistline v. United States*, 226 Ct.Cl. 282, 640 F.2d 1270 (1981), lakefront property owners and the Corps signed a release in connection with the Corps' construction and operation of a dam project on Lake Pend Oreille in Northern Idaho. *Id.* at 1271–73. The *Bistline* releases were incorporated within a document conveying a real property interest, a flowage easement, to the United States, a circumstance indicating that a release of a taking claim had been contemplated and bargained for.[8] *Id.* Here, the releases convey no property interest to the United States. *See* 53 Fed.Cl. at 53.

In *Dureiko v. United States*, 209 F.3d 1345 (Fed.Cir.2000), the Court of Appeals for the Federal Circuit declined to recognize a release as a bar to a takings or inverse condemnation claim absent a showing that such a release was within the intent of the releasor. *Id.* at 1357. That showing has not been made here. There is also a question whether a release could act as a bar to a taking claim that had not ripened when the release was executed. *See id.* at 1356–57; *see also Xanadu of Cocoa Beach, Inc. v. Zetley*, 822 F.2d 982, 986 (11th Cir.1987).

It is far from clear that a release of plaintiffs' Fifth Amendment takings claims was bargained for and expressly contemplated in the executed releases in this case. When the Corps declared in 1993 that it was not required to maintain the Henderson County Drainage District main stem levee because it had obtained a flowage easement when it executed the 1961 release, Pls.' Mem. at 27, the Corps appears to have clarified an uncertainty reaching back to the 1954 correspondence. If, in the 1954 correspondence or in the releases, the Corps had stated that it had no intention of supporting further remedial measures because it viewed the payments as just compensation for a taking of a flowage easement, the plaintiffs might have had a basis for a takings claim at an earlier date. Because genuine issues of material fact exist with respect to plaintiffs' takings claim, the parties' cross-motions for summary judgment are DENIED.

III.  Conclusion

Plaintiff's Motion for Reconsideration with respect to their contract claim is DENIED. Defendant's Motion for Partial Summary Judgment with respect to Plaintiffs' takings claims and Plaintiffs' Motion for Partial Summary Judgment with respect to its takings claims are both DENIED. On or before

---

*also* Transcript of Oral Argument held on March 6, 2002 (Oral Arg. Tr.) at 19. The Corps, however, locates any responsibility it has for levee maintenance under the authority of the public flood emergency assistance program and contends that it has no responsibility for the maintenance of the drainage districts' levees under the Navigation Project authority. *See* Oral Arg. Tr. at 41–42; Transcript of Status Conference on December 7, 2001 (Dec. 7, 2001 Tr.) at 27–28. The Corps also points out that, in 1982, the Henderson District was expelled from the Federal Flood Control Project due to unsatisfactory maintenance of its levee system. *See* Jt.App. at 900; Dec. 7, 2001 Tr. at 12.

The public flood emergency assistance program derives from a series of Flood Control Acts, 33 U.S.C. §§ 701–709a (2001), under which the Corps aids drainage districts in their flood protection by making certain levee improvements. *See* Pls.' Mem. at 6–7. As a condition of performing the levee improvements under the Flood Control Acts, the Corps required levee owners to execute "assurances" in which the respective levee owners agreed: (1) to release the United States from any liability arising from the construction of the levee improvement and (2) to

maintain and operate the levees after completion of the improvements. *Id.* at 7. Among the requirements imposed on a "State ... or other responsible local agency ... [to] maintain and operate flood control works in accordance with regulations prescribed by the Secretary of the Army, as set forth at 33 C.F.R. § 208.10, is the responsibility for the repair of damage caused by erosion or other forces .... [and] [r]egular maintenance repair measures." 33 C.F.R. §§ 208.10(b)(1); *see also* Pls.' Mem. at 7, 8.

8.  The pertinent release language in the document entitled "Warranty Easement" provided:

The Grantors in consideration of the specified sum above written, do hereby release the United States of America, and its assigns, from all claims for damages that have accrued or may hereafter accrue to any or all of the above described lands by reason of the overflow of water occasioned by the construction and operations of the said Albeni Falls Project on the Pend Oreille River, Idaho, or by the exercise of any or all of the rights, powers, privileges and easements hereinabove granted.

*Id.* at 1273.

February 28, 2003, the parties shall file, jointly if they are able to agree and otherwise separately, a proposed schedule of further proceedings in this case together with a proposal of three mutually agreeable dates during the week of March 3, 2003 for a status conference.

IT IS SO ORDERED.