**SYSTEM FUELS, INC. and Entergy Arkansas, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 03–2623C.

United States Court of Federal Claims.

Nov. 9, 2007.

## OPINION AND ORDER

LETTOW, Judge.

The government has moved for reconsideration of the post-trial judgment entered October 16, 2007 in this contract case involving spent nuclear fuel ("SNF"). Judgment was entered on the basis of the court's decision rendered on that same day. *See System Fuels, Inc. v. United States,* 79 Fed.Cl. 37, 2007 WL 3033659 (Oct. 16, 2007) (*"System Fuels III"*). The government's motion raises two issues that merit discussion. One involves an issue of causation associated with the nature and extent of the Department of Energy's contractual obligation to pick up SNF from plaintiffs' two-unit nuclear power plant. The other concerns the standards employed by the court in concluding that modifications to water transfer systems at the spent fuel pools in plaintiffs' power plant were part of plaintiffs' mitigation of, and caused by, defendant's partial breach of contract.

Alexander D. Tomaszczuk, Pillsbury Winthrop Shaw Pittman LLP, McLean, Virginia, for plaintiffs. With him were Jay E. Silberg, Daniel S. Herzfeld, and Jack Y. Chu, Pillsbury Winthrop Shaw Pittman LLP, Washington, D.C., and L. Jager Smith, Jr., Wise Carter Child & Caraway, P.A., Jackson, Mississippi.

Joshua E. Gardner, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him were Peter D. Keisler, Assistant Attorney General, Civil Division, Jeanne E. Davidson, Director, Harold D. Lester, Jr., Assistant Director, Alan J. Lo Re and Marian E. Sullivan, Senior Trial Counsel, and Scott R. Damelin and Lisa L. Donahue, Trial Attorneys, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Jane K. Taylor, Office of General Counsel, United States Department of Energy, Washington, D.C.

## BACKGROUND FACTS

On June 30, 1983, the Department of Energy ("DOE") and plaintiffs (collectively, "System Fuels") entered into a so-called Standard Contract for Disposal of Spent Nuclear Fuel and/or High–Level Radioactive Waste. DX 1 (DOE Contract DE CRO 183NE44363) ("System Fuels Standard Contract").[1] In essence, that contract calls for DOE to collect and dispose of SNF generated by System Fuels' two-unit Arkansas Nuclear One ("ANO") power plant at Russellville, Arkansas, in exchange for payment of a one-time fee and continuing fees based upon the amount of electricity produced at the plant via nuclear means. *Id.* DOE's collection of SNF for disposal was due to begin on January 31, 1998, but thus far DOE has failed to perform. *System Fuels III,* 79 Fed. Cl. at 40–41, 2007 WL 3033659, at *1–2. System Fuels, however, has fulfilled its obligations, duly paying the continuing fees contemplated by the Standard Contract and invoking a contractual option to defer payment of the one-time fee, accruing interest on that

---

1. Citations to plaintiffs' trial exhibits are denoted as "PX ——" and defendant's trial exhibits are shown as "DX ——." The trial transcript is referred to as "Tr. ——."

deferral as the Contract provides. *Id.* at 41–43, 2007 WL 3033659, at *3–4.

System Fuels brought this suit for partial breach of the Standard Contract, and in due course this court granted System Fuels summary judgment on liability. *System Fuels, Inc. v. United States,* 65 Fed.Cl. 163, 177 (2005) (*"System Fuels I"*). The complaint was thereafter amended such that the period covered by this partial breach case extends through June 30, 2006. *See System Fuels, Inc. v. United States,* 73 Fed.Cl. 206, 212 (2006) (*"System Fuels II"*). Following a seventeen-day trial on damages in February, March, and April 2007, System Fuels was awarded $48,651,728 in damages. *System Fuels III,* 79 Fed.Cl. at 40, 68, 2007 WL 3033659, at *1, 38.

### Standard for Decision

The government's motion for reconsideration of the final judgment in System Fuels' favor was timely filed. *See* Rule 59(b) of the Rules of the Court of Federal Claims ("RCFC") ("[A] motion for a new trial, or for amendment or reconsideration of a judgment, shall be filed no later than 10 days after the entry of the judgment."); *see also* RCFC 59(e) ("Any motion to alter or amend a judgment shall be filed no later than 10 days after entry of the judgment."). In essence, the government would have the court "open the judgment" and "amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." RCFC 59(a)(1).

■ A motion for reconsideration constitutes a request for extraordinary relief in a matter that has been closed. *See Caldwell v. United States,* 391 F.3d 1226, 1235 (Fed. Cir.2004) (referring to a required showing of "extraordinary circumstances which justify relief," quoting *Fru–Con Constr. Corp. v. United States,* 44 Fed.Cl. 298, 300 (1999), *aff'd,* 250 F.3d 762 (Fed.Cir.2000) (table)); *see also Four Rivers Invs., Inc. v. United*

*States,* 78 Fed.Cl. 662, 664 (2007); *Amber Resources Co. v. United States,* 78 Fed.Cl. 508, 514 (2007). A court may grant such a motion when the movant shows "(1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice." *Amber Resources,* 78 Fed.Cl. at 514 (quoting *Stockton E. Water Dist. v. United States,* 76 Fed.Cl. 497, 499 (2007)); *see also Bannum, Inc. v. United States,* 59 Fed.Cl. 241, 243 (2003) (same). "To prevail on such a motion, 'the movant must point to a manifest error of law or mistake of fact' and must do more than 'merely reassert[ ] arguments which were previously made and were carefully considered by the court.'" *Bannum,* 59 Fed.Cl. at 243 (quoting *Henderson County Drainage Dist. No. 3 v. United States,* 55 Fed.Cl. 334, 337 (2003)).

### DISCUSSION

**A. Causation Determined By Reference to the Capacity of A Monitored Retrievable Storage Facility Or A Repository**

■ The principal thrust of the government's motion is aimed at the court's rejection of the government's contentions respecting causation. *See* Def.'s Mot. for Reconsideration ("Def.'s Mot.") at 2–5. The parties' dispute over causation had its genesis in the fact that the Standard Contract did not establish a specific rate or schedule for the collection of SNF by DOE from contracting utilities. Rather, the Contract set out a process by which DOE would identify and then collect SNF from the utilities. *See System Fuels III,* 79 Fed.Cl. at 40–41, 2007 WL 3033659, at *2 (citing *Southern Nuclear Operating Co. v. United States,* 77 Fed.Cl. 396, 410 (2007); *Tennessee Valley Auth. v. United States,* 60 Fed.Cl. 665, 668 (2004)).[2] System Fu-

---

2. DOE steadfastly resisted all efforts to specify a collection rate in the Standard Contract. Def.'s Mot. at 8. One of the consequences of DOE's having issued the collection provisions in the Standard Contract in terms of a process rather than a specific rate was that the Contract is ambiguous, or, more properly, indefinite, respecting DOE's collection obligations. That in-

definiteness does not render the Standard Contract illusory or unenforceable, *see Pacific Gas & Elec. Co. v. United States,* 73 Fed.Cl. 333, 375–77 (2006), but it does put a premium on looking to the parties' conduct in implementing the contract as a guide to what the process was intended to produce. *See* 6 Arthur L. Corbin, *Corbin on Contracts* § 579, at 127 (interim ed. 2005) ("As

els relied on that contractual process to establish the baseline for DOE's collection obligations under the Contract and to seek expectancy damages guided by that baseline. *See Indiana Michigan Power Co. v. United States,* 422 F.3d 1369, 1373 (Fed. Cir.2005) ("The [expectancy] remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party performed."). At trial, to describe the non-breach world for the causation aspect of this damages calculus, DOE relied on projected shipments of SNF to a monitored retrievable storage facility ("MRS") for a period of at least ten years, commencing in 1998, without reference to a repository. Def.'s Mot. at 2–5. The court concluded, however, that such a description had a statutorily impermissible predicate and thus could not be applied in determining causation. *See System Fuels III,* 79 Fed.Cl. at 53–54, 2007 WL 3033659, at *18–19. On reconsideration, the government specifically challenges "the court's finding that DOE sought a MRS that was 'independent' of a federal repository." Def.'s Mot. at 2 (capitals omitted). However, the court made no such finding, and, indeed, it took care *not* to make a finding of that nature. The government has miscast the bases for the court's rulings on causation.

In the Nuclear Waste Policy Act of 1982, Pub.L. No. 97–425, 96 Stat. 2201 (Jan. 7, 1983) ("NWPA") (codified as amended at 42 U.S.C. §§ 10101–10270), Congress authorized "the siting, construction, and operation of repositories" by the federal government for "the permanent disposal of high-level radioactive waste and ... spent nuclear fuel." Pub.L. No. 97–425, § 111, 96 Stat. 2207 (codified at 42 U.S.C. § 10131(a)(4), (b)(1)). Although the Act focused on siting and developing repositories, some recognition was given to the potential utility of temporary or interim facilities. DOE was directed to study the "option" of monitored retrievable storage and to report to Congress on "the need for and feasibility of ... construction

of one or more monitored retrievable storage facilities." Pub.L. No. 97–425, § 141(b)(1), 96 Stat. 2241 (codified at 42 U.S.C. § 10161(b)(1)); *see also id.* at § 220, 96 Stat. 2254 (codified at 42 U.S.C. § 10200).

In due course, DOE proposed that Congress authorize a MRS that "might serve as a receiving station and temporary storage facility, and [which] DOE might use ... to prepare SNF for emplacement in [a] repository." *System Fuels III,* 79 Fed.Cl. at 44, 2007 WL 3033659, at *5 (citing DX 53 (DOE, Monitored Retrievable Storage Submission to Congress (March 1987)) at 4). Congress responded by authorizing a "monitored retrievable storage facility subject to [certain] conditions." Nuclear Waste Policy Amendments Act of 1987, Pub.L. No. 100–203, § 5021, 101 Stat. 1330–227, 1330–232 (codified at 42 U.S.C. § 10162(b)). The conditions took the form of linkages between DOE's authority to proceed with a MRS and progress by DOE on a permanent repository. First, DOE could not site a MRS until the Secretary of Energy recommended a location for a permanent repository. 42 U.S.C. § 10165(b). Second, DOE could not begin to construct a MRS until a permanent repository had been licensed to be constructed, and construction of the MRS or acceptance of SNF by the MRS would have to halt if the repository's license were to be revoked or should construction of the repository cease. 42 U.S.C. § 10168(d)(1), (2). And, third, a MRS would only be permitted to store 10,000 metric tons of uranium ("MTU") until the repository commenced accepting spent nuclear fuel, and the MRS could never store more than 15,000 MTU at any given time. 42 U.S.C. § 10168(d)(3), (4); *see System Fuels III,* 79 Fed.Cl. at 42–43, 2007 WL 3033659, at *5. In short, by statute, a MRS could only be constructed and operated "as part of an integrated nuclear waste management system" that included a repository. 42 U.S.C. § 10168(b); *see System Fuels III,* 79 Fed.Cl. at 53–54, 2007 WL 3033659, at *19.

In planning documents issued between 1987 and 1990, DOE projected acceptance of

long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it

will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue.").

SNF and, in doing so, began to rely on a MRS as a precursor to a repository. *See System Fuels III,* 79 Fed.Cl. at 43–44, 2007 WL 3033659, at *6. Siting a MRS proved to be difficult, however. In September 1991, the General Accounting Office issued a report stating that it was "highly unlikely" that a MRS would be available by 1998. PX 198 (General Accounting Office, Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998 (Sept.1991)) at 5, 32. Then, in December 1991, DOE published its Annual Capacity Report ("ACR") for 1991, recognizing that a MRS would not be feasible by 1998 unless Congress removed the linkages between a MRS and a permanent repository. PX 168 (DOE, Annual Capacity Report (Dec.1991) ("1991 ACR")) at 4. Nonetheless, in the 1991 ACR, DOE set out rates of acceptance of SNF from contracting utilities that assumed that Congress would act to remove the siting and licensing linkages and reflected the lower capacity limit for a MRS. *Id.* at 4–5.

The government's causation contentions at trial rested on the rates of acceptance set out in the 1991 ACR, which rates were to cover a ten-year period from 1998 through 2007. PX 168 (1991 ACR) at 5. As events unfolded, a site for a MRS was never found. The siting efforts by a Nuclear Waste Negotiator were unsuccessful, and, by December 1992, DOE sought a "new strategy" for a MRS, involving use of "[f]ederal [g]overnment sites." PX 82 (Letter from Secretary James D. Watkins to Senator J. Bennett Johnston (Dec. 17, 1992)) at HQR–038–0090, 0092. That strategy also was unavailing. Moreover, by 1994 DOE knew it was highly unlikely that Congress would remove the licensing and construction linkages between a MRS and a repository. *System Fuels III,* 79 Fed.Cl. at 44, 2007 WL 3033659, at *7 (citing Tr. 3560:9 to 3561:8 (Test. of Christopher Kouts, Director, Office of Systems Analysis and Strategy Development, Office of Civilian Radioactive Waste Management, DOE)). Thus, the assumptions underlying the 1991 ACR were becoming so unrealistic that DOE reverted to planned use of a repository without a MRS

and announced in May 1994 that "it would not begin SNF collection until 2010 because its planned storage repository would not be ready until then." *Indiana Michigan,* 422 F.3d at 1372 (citing DOE, *Waste Acceptance Issues,* 59 Fed.Reg. 27,007–08 (May 25, 1994)). In 1995, President Clinton delivered the *coup de grace* to a MRS by stating that he would veto legislation removing the linkages between a MRS and a repository. *System Fuels III,* 79 Fed.Cl. at 44–45, 2007 WL 3033659, at *8 (citing Tr. 3545:5 to 3547:18 (Kouts) ("[T]he President's objection to the deployment of interim storage was that … the program should focus its efforts on a repository and site a repository prior to the time that an interim storage site was ultimately selected.")); *see also* Tr. 3435:25 to 3436:15 (Kouts). Nonetheless, DOE, in an ACR issued in March 1995, still applied "[t]he projected nominal acceptance rates" from the 1991 ACR, not withstanding the fact that those rates were premised upon a capacity-limited MRS. *See System Fuels III,* 79 Fed.Cl. at 44–45, 2007 WL 3033659, at *8 (quoting PX 222 (DOE, Acceptance Priority Ranking & Annual Capacity Report (Mar. 1995) ("1995 ACR"))).

As the court concluded in *System Fuels III,* the acceptance rates for SNF set out in the 1991 ACR "contravened both the statute and the SNF-collection process set out in the Standard Contract" because they rested on the assumption that Congress would vitiate some, but not all, of the linkages between a MRS and a repository. *System Fuels III,* 79 Fed.Cl. at 52–53, 2007 WL 3033659, at * 18. DOE took a significant risk when it issued the 1991 ACR. Congress might thereafter have retrospectively validated DOE's assumptions by amending the statute. However, if Congress did not so act, DOE would be left in a virtually untenable position. The latter course of events proved to be what happened. Moreover, DOE made its position worse when it issued an ACR in 1995 that continued to apply the rates set out in the 1991 ACR even though it knew there was no chance that a capacity-limited MRS could be developed and operated.[3]

---

3. DOE did not reformulate its acceptance rates until 2004, when it issued a new ACR that reflected operation commencing at a repository located at Yucca Mountain, Nevada. *See* PX 7–K

Accordingly, the court emphatically did *not* find that DOE "sought" a MRS that was independent of a federal repository. But, DOE's assumptions about linkages were not validated by Congress, and DOE ended up with rates of acceptance that in effect were predicated upon a MRS that was projected to operate independently from a federal repository—for the time period relevant to this case—contrary to the NWPA. If DOE had actually applied the statutory licensing and construction linkages, a MRS could have operated only approximately five years before a repository would have had to come on-line and to operate in conjunction with a MRS. *See System Fuels III*, 79 Fed.Cl. at 53–54, 2007 WL 3033659, at *19. In short, DOE made a bet with long odds when it issued its 1991 ACR, and it lost. When it continued to maintain its posture in the 1995 ACR, DOE had no grounds of any kind for its action.

In its motion for reconsideration, the government asserts that the failure of "the planned abrogation of the linkage between the construction authorization for the [f]ederal repository and the MRS" is "irrelevant for determining DOE's performance obligations in the 'but for' world." Def.'s Mot. at 4. The government further contends that "there is no evidence in the record" that its assumption in the 1991 ACR about abrogation of some linkages "was unreasonable." *Id.* DOE's assertions miss the fundamental point respecting causation. DOE's assumption about removal of the linkages might, or might not, have been reasonable in 1991. However, it could have proven to be reasonable only if Congress subsequently had acted as DOE assumed. Failing such retrospectively validating action, DOE had no basis for its position. In all events, DOE's assumption was proven not to be reasonable as early as

1994, and emphatically so in 1995. The government's contentions regarding causation at a capacity-limited, low rate of acceptance at a MRS operating without an attendant repository are unavailing.[4]

### B. *Causation Respecting ANO's New Water Transfer System*

■ The damages phase of this case turned on System Fuels' mitigation of DOE's breach of the Standard Contract. To address DOE's failure to collect ANO's SNF, System Fuels expanded its independent spent fuel storage installation ("ISFSI") located on ANO's plant premises. *See System Fuels III*, 79 Fed.Cl. at 55–56, 2007 WL 3033659, at *21–22. In conjunction with that work, System Fuels modified aspects of the plant facilities, among other things, replacing water transfer systems used for the spent fuel pools at ANO. *Id.* at 57–58, 2007 WL 3033659, at *24. The government challenged inclusion of the costs of the new water transfer systems in System Fuels' damages, but the court concluded that those costs were recoverable. *Id.*

In its motion for reconsideration, the government renews its objection to inclusion of the costs of the new water transfer systems in System Fuels' damages. Def.'s Mot. at 11–13. The government contends that "[t]he evidence at trial established that plaintiffs would have pursued the installation of a[new] permanent water transfer system regardless of DOE's delay in SNF acceptance." *Id.* at 12. This contention is part of a broader argument by the government that the court treated several of the government's contentions as challenges to the reasonableness of System Fuels' mitigation rather than as disputes over causation. Def.'s Mot. at 13–15.

(DOE, Acceptance Priority Ranking & Annual Capacity Report (July 2004)) at 2.

4. The government also objects to the court's action in declining to find a specific rate of acceptance that DOE would have projected or achieved with disposal at a repository. *See* Def.'s Mot. at 10 ("The court cannot determine damages without determining the acceptance rate to which the government was contractually obligated.") (capitals omitted). However, the

court's determination that a rate had to be determined by reference to a repository, including, perhaps, a MRS operating in conjunction with a repository, was sufficient to address causation. As explained in *System Fuels III*, 79 Fed.Cl. at 54–55, 2007 WL 3033659, at *20, with operations by DOE using such a facility or facilities, System Fuels "would have been able to avoid expanding the dry storage facility" either through re-racking (System Fuels' preferred short-term alternative), encroaching on full-core-reserve in the pools, exchanges, or increased

Allocation of the burden of proof underlies this argument.[5]

Conceptually, the court's analysis of the disputes over System Fuels' damages had four sequential components. First, the court examined the facts to determine whether System Fuels had met its burden of proof to recover damages, *i.e.*, whether it had shown that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *System Fuels III*, 79 Fed.Cl. at 52, 2007 WL 3033659, at *13 (quoting *Indiana Michigan*, 422 F.3d at 1373). Second, the court evaluated whether System Fuels' chosen method of mitigation, expansion of the ISFSI, was reasonable. *Id.* at 55–56, 2007 WL 3033659, at *21–22. Third, the court addressed those particular aspects of System Fuels' mitigation that were contested by the government. *Id.* at 55–65, 2007 WL 3033659, at *22–34. Fourth, and finally, the court considered the government's claims for offset or recoupment. *Id.* at 64–69, 2007 WL 3033659, at *34–39.

As part of the first step, examining whether System Fuels had proven foreseeability, causation, and damages with sufficient certainty, the court explored causation in overarching terms, looking at, among other things, whether DOE's breach had directly caused System Fuels to expand the ISFSI and the extent to which it had done so. *System Fuels III*, 79 Fed.Cl. at 51–55, 2007 WL 3033659, at *17–20. In that connection, for example, the court addressed the government's claims that the non-breach circumstances should be defined by DOE's rate of acceptance of SNF as specified in the 1991 and 1995 ACRs. *Id.; see supra.*

However, contrary to the government's current contentions, when the court turned to the third analytical step, examining particular aspects of System Fuels' mitigation, the court did not confine itself to a determination of whether particular aspects were reasonable. *See System Fuels III*, 79 Fed.Cl. at 48–49, 2007 WL 3033659, at *13 (" '[M]itigation damages' are intended to reimburse a non-breaching party to a contract for the expenses it incurred in attempting to rectify the injury the breach caused it.") (quoting *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1320 (Fed.Cir.2007) (citing *Restatement (Second) of Contracts* § 347 cmt. c (1981))); *see also Restatement (Second) of Contracts* § 350 cmt. b ("As a general rule, a party cannot recover damages for loss that he could have avoided by reasonable efforts."). Instead, where necessary to a logical analysis, the court also looked to whether the contested action had itself been caused by DOE's breach. *See System Fuels III*, 79 Fed.Cl. at 56–58, 2007 WL 3033659, at *23–24 (analyzing the installation of new water transfer systems for the pools at ANO in the terms of causation).

The new permanent water transfer system was installed in conjunction with the shift to the Holtec casks. That installation at the pools at ANO was "reasonable" because (1) the original water transfer systems were inefficient and (2) an alternative, temporary replacement system used at ANO was physically incompatible with a work platform required for the new Holtec casks to be used with the expanded ISFSI and posed a risk of leaks and spills. *System Fuels III*, 79 Fed. Cl. at 57–58, 2007 WL 3033659, at *24. The more difficult question was whether DOE's breach constituted a direct cause of the new installations, given that the risk of leaks and spills was present when the temporary replacement system was used with the VSC–24 casks that System Fuels used before shifting to Holtec casks. *Id.* The government renews its contention that the risk of leaks and spills meant that the temporary system would have been replaced even absent DOE's breach. Def.'s Mot. at 12–13. However, the replacement actually occurred upon DOE's partial breach, not before. Notably, the temporary

---

allocations. *Id.* at 54–55 & 58 n. 21, 2007 WL 3033659, at *20 & n. 21.

**5.** System Fuels as plaintiff bears the burden of showing the elements necessary to obtain damages for breach of contract, including causation. *See Indiana Michigan*, 422 F.3d at 1373 (citing

*Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed.Cir.2002)). By contrast, the breaching party has the burden of showing that the non-breaching party's efforts at mitigation were unreasonable. *See Indiana Michigan*, 422 F.3d at 1375; *First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316–17 (Fed.Cir.2005).

system was physically incompatible with a Holtec work platform that was a key part of System Fuels' mitigation. *System Fuels III,* 79 Fed.Cl. at 57–58, 2007 WL 3033659, at *24. In addition, the use of the heavier, more complicated Holtec casks would have engendered an increased risk of leaks and spills even if no physical incompatibility had existed. *Id.* Consequently, the court concluded that direct causation was established between the breach (leading to the use of the Holtec casks) and the installation of new water transfer systems. In this connection, the government's motion for reconsideration neither raises any new matter nor shows that an error was made. Thus, the prior ruling stands.[6]

### CONCLUSION

For the reasons stated, the government's motion for reconsideration is DENIED.

IT IS SO ORDERED.

---

6. The court has examined the other grounds put forward by the government in its motion for reconsideration and finds them without merit.