**CITY OF GETTYSBURG, SOUTH DAKOTA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–773 L.

United States Court of Federal Claims.

March 16, 2005.

Tim R. Shattuck, Woods, Fuller, Shultz & Smith P.C., Sioux Falls, South Dakota, for the plaintiff.

Thomas L. Sansonetti, Assistant Attorney General, and Susan V. Cook, Senior Attorney, Environmental and Natural Resources Division, United States Department of Justice, Washington, D.C., for the defendant.

## OPINION

BUSH, Judge.

This takings case is currently before the court on defendant's Motion To Dismiss Complaint For Failure To State A Claim Or In The Alternative For Summary Judgment And Memorandum In Support Thereof. For the reasons set forth herein, defendant's Motion For Summary Judgment is hereby granted.

## BACKGROUND

### I. Factual Background

Plaintiff, the City of Gettysburg, South Dakota, is an incorporated municipality located in Potter County (City). The City is approximately sixteen miles east of the Oahe Reservoir located on the Missouri River (Reservoir). In the 1960's, the City obtained its water from two wells located within the City. However, in the mid–1960's, the City began to look for alternative water sources because of the poor quality of the wells and the high costs of maintaining them. Consequently, in the early 1970's, the City explored the possibility of constructing a system to transport water from the Reservoir to the City. The Reservoir was formed by the creation of the Oahe Dam, as authorized by the Flood Control Act of 1944, Pub.L. No. 534, 58 Stat. 887 (1944) (codified as amended in scattered sections of 33 U.S.C. §§ 701–1, *et seq.*), to serve the purpose of flood control and

navigation.[1] According to plaintiff, the United States Army Corps of Engineers (Corps) owns or controls the Reservoir up to the Corps' property line located at an elevation of approximately 1680 feet up the Reservoir slope.

Thus, in October 1972, an engineering firm recommended that the City construct a water transmission system from the Reservoir to the City and that the City begin with the project as soon as possible because of problems being experienced with the existing water system. The proposed project included an intake structure exiting the Reservoir to a pumphouse on the east bank of the Reservoir, an underground transmission pipeline running east approximately two miles from the pumphouse to a water treatment facility, and an underground transmission pipeline running approximately fourteen miles from the treatment facility to the City. The intake structure, the pumphouse, and the first portion of the underground pipeline were to be located on property owned or under the control of the Corps.

In December 1972, the City wrote to the Corps to apply for an easement which would give the City a right-of-way from the government to build and maintain the water transport system. The easement was necessary because the water transport system would be located, in part, on land owned or under the control of the Corps. The Corps responded by detailing the information it needed in order to consider an application for an easement, and the City complied by furnishing the data requested.

In an internal memorandum dated May 11, 1973, the Corps recommended that the City be granted the requested right-of-entry on the designated Corps property, pending final consideration of the City's request for an easement. Subsequently, on July 25, 1973, the Corps forwarded to the City proposed easement No. DACW45–2–74–6007 granting the City, for a fifty-year term, a right-of-access across the Corps' land for the withdrawal of water from the Reservoir.

The Corps also provided the City with a list of requirements for obtaining a permit under Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403. As of August 28, 1973, the City had requested a Section 10 permit, which it received on November 12, 1973 (Permit). The Permit was officially signed by the Corps on November 12, 1973 and by Mayor Klein, on behalf of the City, on November 14, 1973. Distinct from the requested easement, the Permit allowed the City to maintain the water intake structure, lay an intake line, and construct a pumphouse in the Reservoir. The Permit specifically did "not convey any property rights either in real estate or material" and

---

1. The creation of the Oahe Dam and the Oahe Reservoir was a result of severe floods that had devastated the lower Missouri River Basin in 1943 and 1944. *See ETSI Pipeline Project v. Missouri,* 484 U.S. 495, 500, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988). At the behest of Congress, the United States Army Corps of Engineers (Corps) prepared a report that described a comprehensive plan to develop the entire basin, known as the Pick Plan for its author, a colonel in the Corps. *Id.* The Pick Plan proposed the construction of twelve multi-purpose reservoirs, which included the creation of the Oahe Reservoir. The Pick Plan stressed flood control as the primary objective, but also stated that the project would aid with irrigation, navigation, power, domestic and sanitary purposes, wildlife, and recreation. *Id.* (citing H.R. Doc. No. 475, 78th Cong., 2d Sess., at 29 (1944)). The report estimated the gross storage capacity of the Oahe Reservoir at about six million acre-feet of water. At the same time, the Interior Department's Bureau of Reclamation independently completed its own plan to develop the basin, known as the Sloan Plan. *Id.* at 500, 108 S.Ct. 805. Because Congress could

not proceed with both plans at once, a committee was composed with representatives from both the Corps and the Bureau of Reclamation. *Id.* at 501, 108 S.Ct. 805. The committee proposed a plan that incorporated aspects from both the Pick Plan and the Sloan Plan. *Id.* The Oahe Reservoir was to be created by construction of a high dam and to have a gross storage capacity of nineteen million acre-feet of water. The stated purpose of Lake Oahe was to allow "the irrigation of 750,000 acres of land in the James River Basin, as well as to provide useful storage for flood control, navigation, the development of hydroelectric power, and other purposes." *Id.* (citing S. Doc. No. 247, 78th Cong., 2d Sess., at 3 (1944)). Thus, Congress enacted the Flood Control Act of 1944. *See* Flood Control Act of 1944, Pub L. No. 534, §§ 4, 6, 58 Stat. 887, 889–90 (1944). The Act specifically states that the Oahe Reservoir is under the control of the Secretary of the War. *Id.* The title "Secretary of War" was changed to the title "Secretary of the Army" in 1947. *See* National Security Act of 1947, Pub.L. No. 253, § 205(a), 61 Stat. 501 (1947).

contained a release from liability clause stating that "the United States shall in no way be liable for any damage to any structure or work authorized herein which may be caused by or result from future operations undertaken by the Government in the public interest." Def.'s Ex. 10. at 35–36.

Accordingly, in 1973, the City proceeded with construction of the water transmission system. The water supply system was constructed in or around 1973 through 1974 and completed in mid–1975. The water supply system included a water intake structure located on the floor of the Reservoir which carried water to the pumphouse on the east bank of the Reservoir in an inlet called Whitlock's Bay. An underground transmission line then ran from the pumphouse 2.5 miles east to a water treatment plant. Following that, an underground transmission pumpline ran 13.5 miles from the water treatment plant to the City. According to the complaint, the water supply system was the City's sole source of water. As stated previously, the intake structure, the pumphouse, and the first portion of the underground pipeline were located on property owned or controlled by the Corps. The total cost for the project was $864,000.

On September 25, 1975, after construction of the project had been completed, the City advised the Corps that the easement requested in 1972 had not yet been issued. On that date, the City wrote to the Corps requesting that a permanent easement be issued. On November 18, 1975, the Corps responded with a statement that the City's request for a permanent easement was still being processed and had not yet been approved. A year and a half later, on June 2, 1977, the Corps sent the City another proposed easement with purportedly different terms than the previous one. On October 18, 1977, the Corps sent the City yet another proposed easement to replace the one sent in June of that year.

A fourth proposed easement was then sent to the City on January 24, 1978. Finally, on March 7, 1978, the Corps formally issued Easement No. DACW45–2–78–6002 (Easement) granting the City a right-of-way to construct, operate and maintain the pipeline and pumping station. Defendant acknowledges that the drafting of the easement was in progress for several years. Defendant states that it does not know why the Easement was not finalized until 1978.

Paragraph 7 of the Easement contains the following clause:

The United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the use and occupation of the said premises, nor for damages to the property of the grantee, nor for damages to the property or injuries to the person of the grantee's officers, agents, servants, or employees, or others who may be on said premises at their invitation or the invitation of any one of them, arising from or incident to government activities, and the grantee shall hold the United States harmless from any and all such claims.

Def.'s Ex. 26 at 64.

On March 7, 1978 the Corps also issued License No. DACW45–3–78–6001 (License), which gave the City right-of-use of a nearby strip of land for a period of two years as a temporary work site to construct the water intake structure and pumping station. The License was scheduled to expire on March 6, 1980. The granting of the License was the natural corollary to the Easement and the Permit. Whereas the Easement allowed the structures to remain on governmentally controlled land for a period of fifty years, and the Permit authorized those structures, to the extent applicable, to reside in the navigable waters of the United States, the License allowed the City to have access to government land as a work site for two years in order to construct the water transmission system. Paragraph 4 of the License contained release language similar to that in the Easement.[2]

---

2. The release clause in the License states:
That the United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the privileges herein granted, or for damages to the property of the licensee, or for injuries to the person of the licensee, or for damages to the property or injuries to the

The City asserts that by September 1978 it still had not received copies of the Easement or the License and inquired about both documents at that time. Defendant disagrees with this contention and avers that the City received a copy of the Easement near the time of execution. Regardless, both parties agree that the Corps finally forwarded copies of the License and Easement on October 16, 1978 to plaintiff, years after construction of the water system was completed.

Despite receiving the documents, the City claims that the terms contained in the Easement and the License were never accepted by the City, as demonstrated by the fact that the neither the Easement nor the License were ever signed by the City. Plaintiff contends that because the City did not sign the Easement or the License, it did not agree to the specific terms contained therein, most notably, the release from liability clauses at issue in this lawsuit.

Defendant responds that as part of obtaining the Easement, Mayor Klein executed an agreement assuring the City's compliance with the Department of Defense's directive under Title VI of the Civil Rights Act of 1964 (Assurance). Defendant contends that the Assurance, as signed by the mayor, constitutes acceptance of the terms of the Easement. The City contends that execution of the agreement was not necessary to obtain the Easement.

With respect to the License, plaintiff argues that because the City never signed the License, it did not assent to the release from liability clause contained therein. Defendant opposes this contention, averring that the License was indeed signed by the City's mayor. Defendant argues that the mayor's typed signature was a valid signature and constitutes acceptance of the terms of the License.

The City operated the water transmission system without any significant problems until 1995. However, beginning around the summer of 1995, landslides developed on the Reservoir's slope where the intake structure, pumphouse and underground transmission pipelines were located. As a result of these landslides, breaks began to develop in the underground water pipeline running east from the pumphouse up the slope. According to the affidavit of Mr. Elmer Nitzschke, city attorney for the City of Gettysburg, approximately eight breaks occurred in pipelines located on Corps' property, while the remaining fifteen breaks occurred on pipelines located on non-governmentally owned property. The landslides eventually caused damage to the pump itself starting in the summer of 1995. For two years, the City struggled with repairing numerous breaks in the pipeline. By late 1997, the damage became so severe that the pumphouse and water transmission pipeline were irreparable and the City was forced to abandon the water supply system.

Plaintiff contends that the landslides on the slope of the Reservoir were caused by the Corps' construction, management and operation of the Reservoir. Plaintiff alleges that the damage to the City's water supply system constitutes a taking of the City's property without just compensation and in violation of due process under the Fifth Amendment of the United States Constitution. Plaintiff claims that it has suffered damages in an amount exceeding $1,000,000.

Defendant's main defense, as asserted in its motion, is that plaintiff's takings claim fails because the release language contained in the Easement, License, and Permit precludes suit. Defendant contends that this is the case because the water supply system in question was located on land owned by the government to which the License, Easement and Permit applied. Defendant also contends that damages should be limited in that regard because, even prior to the City's abandonment of the water system in 1997, the City had been investigating switching to an alternative source of water. Defendant finally asserts that the government shoul-

person of the licensee's officers, agents, servants, or employees, or others who may be on said premises at their invitation or the invitation of any one of them, arising from or incident to governmental activities on the said

premises, and the licensee shall hold the United States harmless from any and all such claims.
Def.'s Ex. 27.

dered much of the cost for the City to switch to an alternative water source.

## II. Procedural History

Plaintiff filed its complaint against defendant on December 20, 2000. On September 6, 2002, defendant filed its Motion to Dismiss Complaint For Failure To State A Claim Or In The Alternative For Summary Judgment. With it, defendant filed an appendix of exhibits but failed to include its proposed findings of uncontroverted fact pursuant to Rule 56(h) of the United States Court of Federal Claims (RCFC). On October 4, 2002, plaintiff filed its response to defendant's motion, also without submitting any proposed findings of fact. To rectify the error, on October 10, 2002, the court ordered defendant to file its proposed findings of fact by November 12, 2002. *City of Gettysburg v. United States,* No. 00–773 L, slip op. at 2 (Oct. 10, 2002). The court ordered the Clerk's office to return plaintiff's response to plaintiff and for plaintiff to resubmit its response by December 13, 2002. On that date, plaintiff filed its Brief in Opposition to Defendant's Motion, Plaintiff's Statement Of Uncontroverted Facts, and Plaintiff's Response To Defendant's Proposed Findings Of Uncontroverted Fact In Opposition to Defendant's Motion For Summary Judgment. On January 28, 2003, defendant filed its Reply On Its Motion To Dismiss Or In The Alternative for Summary Judgment.

On October 15, 2003, this court ordered the parties to file supplemental briefs regarding various issues and questions the court had propounded to the parties. In particular, the court required the parties to discuss whether the conduct herein constituted a tort over which this court lacked jurisdiction. Defendant filed its supplemental brief on December 17, 2003 stating that the government is not asserting as one of its defenses that this court lacks jurisdiction over plaintiff's action because the claim sounds in tort.[3] Again on December 22, 2004, the court ordered that additional supplemental briefs be filed on specified issues propounded by the court.

Now that the briefing is complete, the court renders this opinion.

## DISCUSSION

### I. Standard of Review

Defendant has moved this court to dismiss plaintiff's claim under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. RCFC 12(b) provides that "[i]f on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56." RCFC 12(b). Both parties have referred to extra-pleading materials in support of their respective positions. Plaintiff submitted, and references in its brief, the affidavit of Elmer Nitzschke, city attorney for the City of Gettysburg, in its opposition. Defendant has submitted thirty-two exhibits in support of its motion. Once the court decides to accept extra-pleading material, it must convert the 12(b)(6) motion into a Rule 56 motion. *Schultz v. United States,* 5 Cl.Ct. 412, 416 (1984) (because plaintiff presented matters outside the pleadings, court was required to treat motion for judgment on the pleadings as a motion for summary judgment); *see also De Brousse v. United States,* 28 Fed.Cl. 187, 188 (1993) (treating motion to dismiss as motion for summary judgment because extra-pleadings matters were not excluded by the court); *Keating v. BBDO International, Inc.,* 438 F.Supp. 676, 679–80 (S.D.N.Y.1977) (under the Federal Rules of Civil Procedure).

RCFC 12(b) provides that when an RCFC 12(b)(6) motion is converted into an RCFC 56 motion, the parties "shall be given a reasonable opportunity to present all material made pertinent to such a motion by RCFC 56." RCFC 12(b); *see also Thoen v. United States,* 765 F.2d 1110, 1114 (Fed.Cir.1985) ("Cases from this court and other courts underscore the importance of the opportunity for the opposing party to counter a sum-

---

**3.** Plaintiff filed its supplemental brief on January 16, 2004. The parties were also given time to file respective responsive briefs.

mary judgment motion."). In this instance, because defendant moved in the alternative for summary judgment, plaintiff has had ample time to submit materials and arguments against summary judgment. This is evidenced most clearly by the affidavit and materials submitted by plaintiff with its opposition brief. Plaintiff, itself, agrees that defendant's motion should be reviewed under a RCFC 56 standard.

Accordingly, because the court does not exclude the extra-pleading materials submitted by the parties and because plaintiff has had ample opportunity to present all materials and arguments in support of its position against defendant's motion for summary judgment, defendant's motion to dismiss will be treated as a motion for summary judgment under RCFC 56. *See* RCFC 12(b).

The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). Defendant, as the moving party, has the burden of establishing the absence of disputed genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the capacity of opposing defendant's motion, plaintiff has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment pursuant to RCFC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir. 1984).

Defendant requests that this court rule in favor of its motion for summary judgment on the basis that plaintiff's theories of relief, measured against all evidentiary materials submitted by the parties, do not state a claim upon which relief can be can granted. Thus, the inquiry on this motion for summary judgment is whether, affording plaintiff the presumptively favorable view of the facts to which it is entitled, defendant has discharged its burden of showing that it is entitled to judgment as a matter of law.

## II. Analysis

### A. Preliminary Inquiries

Having determined that the RCFC 56 summary judgment standard will apply to the instant motion, the court will first review preliminary inquiries the parties have presented in their submissions. In particular, the court must address (1) whether plaintiff has a proper cognizable property interest suitable for raising a takings claim in this court and (2) whether defendant's laches defense bars plaintiff's claim.

#### 1. Cognizable Property Interest

The government argues that the court lacks jurisdiction over this matter because plaintiff does not have a compensable property interest sufficient to assert a Fifth Amendment takings claim. To determine whether plaintiff has a sufficiently cognizable property interest to support its takings claim, it is useful for the court to briefly discuss what a takings claim entails.

Plaintiff alleges that the "damage to the City's water supply system constitutes a taking without just compensation and due process of law under the Fifth Amendment of the United States Constitution." Compl. ¶ 5. When a municipality condemns a property, but fails to conduct an eminent domain proceeding before the taking of the property, the action is one for "inverse condemnation."[4] *See Agins v. City of Tiburon,* 447

4. To "condemn" property in this sense means to determine and declare property to be assigned to

U.S. 255, 258 n. 2, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) ("Inverse condemnation should be distinguished from eminent domain. Eminent domain refers to a legal proceeding in which a government asserts its authority to condemn property. Inverse condemnation is 'a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.'") (citing *United States v. Clarke*, 445 U.S. 253, 257, 100 S.Ct. 1127, 63 L.Ed.2d 373 (1980)); *see also* Kim C. Pflueger, *Takings Law—Is Inverse Condemnation an Appropriate Remedy for Due Process Violations?*, 57 Wash. L.Rev. 551, 572 (1982) (stating that a property owner is entitled to institute a suit for inverse condemnation to compel an ex post facto recovery of just compensation) (citing Van Alstyne, *Taking Or Damaging By Police Power: The Search For Inverse Condemnation Criteria*, 44 S. Cal. L.Rev. 1 (1970); *Note, Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance*, 26 Stan. L.Rev. 1439 (1974)). Neither party in this action alleges that any formal condemnation proceeding in this matter has been instituted.

In view of the fact that this matter is an inverse condemnation action, this court must next address the threshold question as to whether there is subject matter jurisdiction to entertain this case. The court entertains the jurisdictional questions first and foremost, since jurisdiction is a prerequisite which must be met prior to any substantive issues presented by summary judgment. *See Lockheed Martin Corp. v. United States*, 50 Fed.Cl. 550, 553 (2001), *aff'd*, 2002 WL 31164088 (Fed.Cir. Sept.30, 2002) (unpublished).

■ A jurisdictional requirement to bring a takings claim in this court is that the government's action be authorized. *See Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed.Cir.1993) (citations omitted); *Sun Oil Co. v. United States*, 215 Ct.Cl. 716, 572 F.2d 786, 819 (1978). The United States possesses the requisite authority to improve navigable waters of the United States in the interest of improving navigation. 33 U.S.C. § 1, *et seq.*; *see also United States v. Kansas City Ins. Co.*, 339 U.S. 799, 804, 70 S.Ct. 885, 94 L.Ed. 1277 (1950). The Army Corps of Engineers has been delegated with the responsibility of care and guardianship of the navigable waters of the United States. 33 U.S.C. § 1, *et seq.*; 33 C.F.R. § 322.5 (2004). Both parties in this case agree that the Oahe Reservoir constitutes navigable waters of the United States.[5] Defendant asserts that water levels in the Reservoir must, at times, be raised or lowered to assist in the production of hydroelectric power, flood control, downstream navigation, irrigation, etc. This operation is clearly authorized under the power conferred by Congress to the Corps. *See Engineering and Design; Water Control Management*, 47 Fed.Reg. 44,543 (Oct. 8, 1982) (codified at 33 C.F.R. pt. 222) (providing guidance to the Corps of Engineers in performing water control management activities under the Flood Control Act). Accordingly, even if the parties were challenging the Corps' authorization to operate the Oahe Dam, the court, *sua sponte*, finds that the Corps' activity in this matter was authorized.

public use. Black's Law Dictionary 310 (8th ed.2004).

5. In *Alameda Gateway, Ltd. v. United States*, this court recited the inquiry to be used to determine if a body of water constitutes "navigable waters of the United States" in the case of navigable servitudes. 45 Fed.Cl. 757, 764 (1999). The court identified a distinction between Congress' ability to regulate navigable waters of the United States through the Rivers and Harbors Appropriation Act and the government's application of a navigable servitude in the case of a public right-of-access to a water body. *Id.* (citing *Kaiser Aetna v. United States*, 444 U.S. 164, 172, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). Navigational servitude, which derives from the Constitution's Commerce Clause, gives the government a dominant servitude or power to regulate and control the waters of the United States in the interest of commerce. *See United States v. Rands*, 389 U.S. 121, 122–23, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). The court in *Alameda Gateway*, citing *Owen v. United States*, 851 F.2d 1404, 1408–09 (Fed.Cir.1988), went onto observe that the federal navigational servitude defines the boundaries within which the government may supercede private ownership interests in order to improve navigation. *Alameda Gateway*, 45 Fed.Cl. at 763.

■ In addition to demonstrating that the government activity was authorized, plaintiff must also show that it has a cognizable property interest. *See, e.g., Wyatt v. United States,* 271 F.3d 1090, 1097 (Fed.Cir. 2001) (cognizable property interest is a requirement for asserting an action for a compensable taking under the Fifth Amendment), *cert. denied,* 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002). The parties have differing contentions as to whether plaintiff possesses the requisite cognizable property interest. The City asserts that it has a cognizable property interest in its damaged pipelines and related water transmission system equipment by virtue of its ownership of that property. Plaintiff asserts that "[i]t is undisputed that the City owned, installed and maintained the pipeline." Pl.'s Supp. Brief at 7.

Defendant contests the City's assertion that it has a cognizable property interest in the water transmission system structures. Although the government agrees that the City's ownership of the water pipelines and related structures generally constitute personal property and is a property interest, defendant argues that the Section 10 Permit granted to the City merely creates a license to build and maintain permitted structures in the Reservoir and does not convey any property right to the City, based on the fact that the Permit itself states that the instrument does not convey any property rights in real estate or material. Defendant further argues that even if plaintiff were to have a property interest in the physical water transmission system, such system has "no value" absent a connection to a water source, in which plaintiff has no proprietary interest since a party cannot have a property interest in the navigable waters of the United States.[6]

Plaintiff counters that even if the City does not have a property interest in the work authorized by the Permit (the water intake structure, the pumphouse and a portion of the intake line), the City at least has a property interest in the underground pipeline running past the Reservoir towards the City located on non-governmentally controlled or owned property since that work was not under the scope of the Permit. Plaintiff notes that the City was not required to obtain any approval under the Permit for construction of the transmission pipeline running past the pumphouse eastward beyond the Reservoir's slope because that portion of the waterlines was not located in navigable waters nor on government property. Furthermore, the damage to that portion of the pipeline alone, plaintiff argues, rendered the remaining structures, including the pumphouse, water treatment facility and the intake structure, completely useless.

Section 10 of the Rivers and Harbors Appropriation Act of 1899 requires a permit to place structures in navigable waters of the United States (colloquially referred to as a "Section 10" permit). 33 U.S.C. § 403. This statute prohibits the obstruction of navigable waters of the United States except when initiated by a plan recommended by the Corps of Engineers and approved by the Secretary of the Army. *Id.; see also Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1185 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). The Secretary of the Army has delegated to the Corps the authority to issue or deny Section 10 permits. *Id.* at 1186 (citing 33 C.F.R. § 322.5 (1980)).

In this instance, the Permit, along with the Easement and License, authorized the City to construct and maintain the water intake structure, the pumphouse, and the water intake line in the Reservoir. Thus, the issue to be determined is, whether, in light of or despite the license to maintain structures in navigable waters, as afforded by the Permit, plaintiff has a cognizable property interest in the water transmission system. If so, does the property interest further create a distinction between those structures that reside in navigable waters, versus those structures

---

**6.** Plaintiff counterargues that even if the Permit itself may not have granted plaintiff any property rights, the Easement did. It seems counterintuitive that the City would allege that it has a valid, cognizable property interest by virtue of the Easement, while at the same time, arguing that the City never accepted the terms of the Easement in the context of rejecting the release language contained therein. The court addresses this argument in Sec.II.B.1.

merely connected to structures residing in navigable waters.

The Permit states that it "does not convey any property rights either in real estate or material ...." Def.'s Ex. 10 at 35. Defendant argues that this language precludes plaintiff's claim, especially in light of *United States v. 5.96 Acres of Land*, 593 F.2d 884, 888 (9th Cir.1979), upon which defendant relies. The court first notes that though it is true that the Permit grants no property interest in either real estate or material, that does not mean that the City has no property interest at all. That language simply means that no additional property interests are conveyed by virtue of the issuance of the Permit.

Second, the court finds *5.96 Acres of Land* inapplicable to this issue. There, the State of Washington leased aquatic lands located immediately upstream from the Benneville Dam to the Knappton Towboat Company. 593 F.2d 884. Knappton built various pilings, dolphins, and dikes on the leased lands for timber storage. At the same time, the government was completing the Second Powerhouse Project which would raise the water level behind the dam, thereby weakening the structures Knappton had already built. To preserve them, Knappton needed to rebuild the structures at considerable expense. Knappton argued that this constituted a compensable taking under the Fifth Amendment by the federal government.[7]

Knappton, like the City, had received a Section 10 permit under the Rivers and Harbors Appropriation Act, which expressly forbids the construction of any structure in navigable waters unless authorized by the Secretary of the Army. *See* 33 U.S.C. § 403. In *5.96 Acres of Land*, the government argued that the structures built by Knappton were authorized by permits that were revocable at will and therefore, Knappton had no property interest cognizable under the Fifth Amendment.

Knappton tried, albeit too late, to assert that no permit had been obtained. The court noted that in prior pleadings, Knappton never denied obtaining the permit and implicitly admitted that permits had been obtained.

Moreover, the court noted that if no permit had ever been obtained, the structures would have been unlawful and their removal would not have required compensation. *5.96 Acres of Land,* 593 F.2d at 888.

Nevertheless, focusing on the fact that the permits had indeed been issued, the United States Court of Appeals for the Ninth Circuit (Ninth Circuit) held that the Section 10 permit granted Knappton a mere license to build and maintain its structures. *Id.* The court held that, as such, the permit was revocable at will by the government. *Id.* The court also noted that the permit language indicated that the government could require removal of the structures as well. *Id.* Although in *5.96 Acres of Land* the permits were not actually revoked, the court found that the net effect of the permit language and the nature of the Section 10 permit in general lent to finding that Knappton had no cognizable property interest in his structures with respect to the government's ability to revoke the permit or have the structures removed. *Id.*

The Section 10 Permit at issue here contains a revocation clause similar to that found in *5.96 Acres of Land.* This, arguably, would lend to a finding that because the Permit is revocable at will by the government, the City has no cognizable property interest. This notion has been iterated with respect to licenses and permits in general. "Licenses or permits are traditionally treated as not protected by the Takings Clause because they are created by the government and can easily be cancelled by the government and normally are not transferable." *American Pelagic Fishing Co. v. United States,* 49 Fed.Cl. 36, 46 (2001), *rev'd and remanded on other grounds,* 379 F.3d 1363 (Fed.Cir.2004). This is because permits and licenses lack one or more indicia of property ownership. *Arctic King Fisheries, Inc. v. United States,* 59 Fed.Cl. 360, 371 (2004).

Yet this court does not agree with the holding in *5.96 Acres of Land* and finds that a property interest in plaintiff's water transmission system exists. In *Conti v. United States,* the Federal Circuit found that no

---

7. The State of Washington, also a plaintiff in the suit, claimed a loss from the anticipated decrease in rental value of the aquatic lands due to the operation of the dam.

property interest existed in plaintiff's fishing permit, but yet a property interest did exist in plaintiff's fishing vessel and nets when a regulation restricted plaintiff's fishing activities by limiting plaintiff's use of drift gillnets. 291 F.3d 1334, 1343 (Fed.Cir.2002). The Federal Circuit found that plaintiff's mere license to fish did not qualify as a protectable property interest given that the fishing permit did not confer rights generally found in one's bundle of property rights and because the fishing permit was suspendable and revocable. *Id.* at 1341–42. However, plaintiff's physical boat and gear did constitute a property interest sufficient to assert a takings claim. *Id.* at 1343. The same distinction can be drawn in the case at bar. Although the City may not have a property interest in the permit itself, it does have a property interest in its damaged pipeline. The court disagrees with *5.96 Acres of Land's* holding that a Section 10 permit leaves a plaintiff devoid of any property interest when physical structures are damaged. The Ninth Circuit fails to acknowledge those property interests which exist independent of a given permit or license. In this instance, the City is not claiming a taking of any interest conveyed by the Permit, such as the right to occupy navigable waters or have access to government-owned land or an interference with water or lease rights. The claim here, rather, arises out of the frequent breaks in the underground pipeline caused by landsliding on the slopes of the Reservoir. The City seeks recovery for the physical loss of the damaged pipeline and equipment from soil movement allegedly caused by the government's operation of the Reservoir. The City has *specifically* limited its claim to the taking of the physical pipelines and not to a taking of water rights or a right to maintain structures in navigable waters.

Thus, in examining this case in light of *5.96 Acres of Land,* the court agrees with the City that it has a cognizable property interest in the entire water transmission system for the purpose of asserting a Fifth Amendment takings claim. This includes the structures located in the Reservoir (such as the water intake structure, transmission line and pumphouse) and, also, the pipelines leading from the water treatment facility towards the City.

There is no disagreement between the parties that just as having an interest in real property creates a cognizable property interest for the purposes of asserting a cause of action for inverse condemnation, so does one's interest in tangible or personal property. Tangible property may be the subject of a takings claim. *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *Maritrans, Inc. v. United States,* 342 F.3d 1344, 1352 (Fed.Cir.2003) (finding a property interest sufficient for a takings claim in barges); *King v. United States,* 192 Ct.Cl. 548, 427 F.2d 767, 769–70 (1970) (interference with crops due to overflow of river constitutes a sufficient property interest to assert a fifth amendment takings claim).

In further support of the City's claim of a cognizable property interest in this case, the court also examines the holding in *Maritrans.* There, the government argued that since Maritrans utilized its single hull barges in navigable waters of the United States, the property interest Maritrans asserted in the use of its vessels on such waterways could not give rise to a protected property interest since the waters of the United States are public property. 342 F.3d at 1352–53. Similarly here, the government argues that because the water transmission system structures are maintained in navigable waters of the United States, or are connected to structures maintained in navigable waters of the United States, that the City has no cognizable interest. However, the *Maritrans* court found that:

> Those facts do not somehow diminish or eliminate the basic property interest that Maritrans has in its single hull tank barges. Maritrans has various rights in its barges that qualify them as property for Fifth Amendment protection. For example, Maritrans may sell or otherwise dispose of the barges; it may possess and transport them; and it may alter them by adding a second hull.

*Id.* at 1353 (citing *Andrus,* 444 U.S. at 66, 100 S.Ct. 318).

Just as Maritrans had a property interest in its barges, the City has a property interest in the water transmission system and pipe-

lines that it paid for and utilized. Such is the case since the City could have abandoned these lines (which it ultimately did), or could have theoretically sold or otherwise disposed of the pipelines. The right to use and dispose of property is fundamental in the bundle of property rights. In this instance, no other town or city was utilizing the water transmission system and no other entity had paid for its construction. *See Andrus,* 444 U.S. at 66, 100 S.Ct. 318 (suggesting that the right to possess, transport, donate, devise and sell are all "sticks" in the bundle of property rights). It is clear from the facts presented that the City has a cognizable property interest in the water transmission system.

Defendant, lastly, raises an argument in its Supplemental Brief that plaintiff has no cognizable property interest due to the existence of the government's navigational servitude. In particular, defendant asserts that plaintiff cannot have compensable property rights in portions of the water system located below the mean high-water mark of the Reservoir. This argument necessitates an explanation of what the government's navigational servitude entails.

■ All navigable waters are under the control of the United States for the purpose of regulating and improving navigation. *Gilman v. City of Philadelphia,* 70 U.S. (3 Wall.) 713, 724, 18 L.Ed. 96 (1865); *see also Gibson v. United States,* 166 U.S. 269, 272–73, 17 S.Ct. 578, 41 L.Ed. 996 (1897). Although title to the shore and submerged soil of navigable waters belongs to the various states and individual owners, such title is always subject to the government's navigational servitude. *Gibson,* 166 U.S. at 272, 17 S.Ct. 578. This means that the United States has the power to invade property rights in land within the bed of a stream (which includes all lands below the ordinary high-water mark), without paying compensation, when the purpose of the invasion is to aid in the navigability of the stream. *Tri–State Materials Corp. v. United States,* 213 Ct.Cl. 1, 550 F.2d 1, 5 (1977) (citation omitted); *Coastal Petroleum Co. v. United States,* 207 Ct.Cl. 701, 524 F.2d 1206, 1209 (1975), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 567, 66 L.Ed.2d 469 (1980). The bed of a

navigable stream includes the adjacent banks up to the ordinary high-water mark. *Tri–State Materials,* 550 F.2d at 6. Land within the bed is always subject to (or burdened with) the potential exercise of navigational servitude. *Id.* An owner of such land may not claim compensation when the government takes the land pursuant to aiding navigability of the stream. *Id.* (citing *United States v. Chicago, Milwaukee, St. Paul & Pacific R.R.,* 312 U.S. 592, 596, 61 S.Ct. 772, 85 L.Ed. 1064 (1941)).

■ The court does not view the operation of navigational servitude as being controlling in this case. First, not all of the property at issue in this matter is part of the bed of a navigable stream. The majority of the damage claimed by the City is to pipelines not located on the Reservoir bed. Pl.'s Brief in Opp. to Def.'s Mot. to Dismiss at 7; Def.'s Reply to Pl.'s Supp. Brief at 3 ("Indeed the Reservoir itself is located a considerable distance away from, and much lower in elevation than, the area where the majority of pipeline breaks occurred."). *See Owen v. United States,* 851 F.2d 1404, 1411 (Fed.Cir. 1988) (holding that erosion caused by underground seepage occurring below the ordinary high-water mark but outside the stream bed constituted a compensable government taking).

Second, the City is not claiming damage due to a loss of rights in the water. Normally the navigational servitude doctrine is invoked by the government when the government needs to alter the direction of water flow from its natural course. For example in *United States v. Twin City Power Co.,* 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), plaintiff argued that the government's action of altering the flow of a river caused its hydroelectric operations to be impeded since the operations were dependent upon maintaining the status quo of the river. The court held that the flow of the river was subject to navigational servitude and that the owners of "fast lands" (land beyond the bed of a navigable stream) could not be awarded compensation for their interest in that flow if the government caused the flow of the river to be altered. *Id.* at 227, 76 S.Ct. 259. In *United States v. Virginia Electric & Power*

*Co.*, 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961), which also involved water power operations, damage to plaintiff's property included uses of the property not associated with the flow of the river. These non-riparian damages were held compensable, while the riparian uses were held noncompensable due to the application of the government's navigational servitude. *Id.* at 629–31, 81 S.Ct. 784.

In this instance, the court does not see how the value claimed to have been taken derives from the City's access or use of the Reservoir itself. The City is not claiming a loss of access to water or that the raising and lowering of water levels resulted in a direct interference with an operation relying chiefly on water power. The takings claim is solely premised on physical damage done to the water transmission system from the landslides caused by the government's operation of the Reservoir.[8] Simply put, this claim does not relate to a direct reliance on the flow of a navigational stream or a riparian use of a navigable stream (such as fishing, irrigation, or use in a chemical plant process)

to which the government's navigational servitude would preclude recovery. *See Tri–State Materials*, 550 F.2d at 8.[9] Accordingly, the court rejects defendant's argument that the City lacks a cognizable property interest in its water transmission system due to navigational servitude.

Having concluded that plaintiff possesses a cognizable property interest, and just prior to addressing defendant's contention that the doctrine of laches bars plaintiff's claims, it is appropriate to briefly turn to the issue of whether the City's claim sounds in tort. The court notes that although defendant raises in its April 30, 2001 answer the defense that plaintiff's cause of action fails because it sounds in tort, defendant, upon specific inquiry by the court, no longer asserts that the court lacks subject matter jurisdiction over this claim because plaintiff's claim constitutes a tort. The court further notes in this regard that both this court and the Federal Circuit have held that where the government is charged with tortious acts stemming primarily from a contractual obligation, the

8. For the purposes of this decision, the court accepts the City's contention that defendant's actions resulted in the claimed damage, although the court recognizes that there is a dispute of material fact as to whether the government's operation of the Reservoir was actually the source of damage to the City's water transmission system. As explained further in this opinion, the court does not need to address, on the merits, defendant's alleged liability with respect to the damage sustained by plaintiff.

9. The court cannot ignore the holding in *Coastal Petroleum* with respect to the application of navigational servitude in flood control situations. 524 F.2d at 1210. Plaintiff therein argued that the right of the United States to take or use submerged property is limited to actions in aid of navigation, and that the work at issue there was related to flood control as opposed to aiding navigation. The *Coastal Petroleum* court identified a number of cases where this court, and its predecessors, have upheld the application of navigational servitude in instances of flood control projects. *Id.* The court opined that a failure to execute proper flood control mechanisms can have a disastrous effect on navigation and many statutes in which flood control projects are authorized list navigation as a benefit served by such project. *Id.* However *Coastal Petroleum* involved plaintiff's claim of a property right in limestone located at the bottom of a lake floor pursuant to a lease granting plaintiff the right to

mine that limestone and damage based on the building of a levee which prevented mining. The difference herein is that the City is not claiming a property right to a body of water or submerged land leased by the City within a body of water itself. Here, plaintiff is claiming an interest in its own structures and equipment that happen to be located on land in navigable waters. The Supreme Court cases cited in *Coastal Petroleum* are inapposite to this lawsuit. For example, *Twin City Power* involves a claim of the use of navigable waters for plaintiff's hydroelectric plant. 350 U.S. at 232–34, 76 S.Ct. 259. *United States v. Grand River Dam Authority* also involved the taking of water power rights. 363 U.S. 229, 231–33, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960). In *United States v. Commodore Park, Inc.*, 324 U.S. 386, 391–93, 65 S.Ct. 803, 89 L.Ed. 1017 (1945), the issue therein involved the government's dredging of a navigable bay which caused the deposit of dredged materials in a creek, thus reducing the value of riparian property contiguous to the creek. Similarly, in *State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 525–26, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941), the issue therein involved whether the government could construct a dam, which the State of Oklahoma alleged, if built, would impound river waters and cause flooding onto valuable oil-producing property. All of these cases are inapposite to the scenario presented by the City involving physical damage caused by the government's alleged activity.

plaintiff's claim must arise from and be based upon a breach of contract suit and not on the tort. *See, e.g. McAbee Construction v. United States,* 97 F.3d 1431, 1433 (Fed.Cir.1996); *Olin Jones Sand Corp. v. United States,* 225 Ct.Cl. 741, 745, 1980 WL 13211 (1980); *Fountain v. United States,* 192 Ct.Cl. 495, 427 F.2d 759, 761 (1970), *cert. denied,* 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971). Accordingly, because of the government's withdrawal of its assertions that plaintiff's claim sounds in tort and because the court perceives no basis to disagree with defendant, no further examination by the court is deemed necessary on this issue.

### 2. Defendant's Laches Argument

The court must also address whether the City's claim is time-barred, both with regard to the statute of limitations governing suits in this court, and under the doctrine of laches, which defendant has asserted as a defense in its reply brief to the court. The court finds that it is not.

With respect to the statute of limitations governing claims in this court, suits must be brought within six years of the accrual of the claim. 28 U.S.C. § 2501. Accrual takes place when all the events necessary to give rise to the alleged liability have occurred. *Chipps v. United States,* 19 Cl.Ct. 201, 203 (1990) (citations omitted), *aff'd,* 915 F.2d 1585 (Fed.Cir.1990). In the instance of takings, accrual of a claim occurs as of the date of the alleged taking. *See Banks v. United States,* 314 F.3d 1304, 1308 (Fed.Cir.2003) ("The accrual of a takings claim where the government leaves the taking of property to a gradual physical process occurs when the situation has stabilized."); *Boling v. United States,* 220 F.3d 1365, 1370 (Fed.Cir.2000) ("In general, a takings claim accrues when 'all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence.'") (citing *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988)); *Seldovia Native Assoc., Inc. v. United States,* 144 F.3d 769, 774 (Fed.Cir.

1998) (the key date for accrual purposes is the date on which the plaintiff's land has been clearly and permanently taken).

In this instance, the City alleges that in the summer of 1995 and continuing into 1997, landslides, alleged to have been caused by Corps' operation of the Reservoir, caused damage to the City's water transmission pipelines and pumphouse to the point that the City's property was irreparable. Suit commenced on December 20, 2000, thus falling within the Tucker Act's requisite six-year statute of limitations period.

Despite the fact the City's claim meets this statutory requisite, defendant argues that the equitable doctrine of laches should be applied to bar plaintiff's lawsuit. In particular, defendant asserts the defense of laches against plaintiff's argument that because the City never assented to the terms of the Easement, the Easement's release language does not preclude suit. Defendant argues that if the Easement contained terms other than those the City agreed to, the City should have stated so in October 1978, at the time the Easement was finalized, instead of during this present litigation.

Normally, under RCFC 8(c), the affirmative defense of laches must be plead in the first responsive pleading or it is deemed waived and excluded. *See Todd v. United States,* 155 Ct.Cl. 87, 292 F.2d 841, 843 (1961); *Dean v. United States,* 10 Cl.Ct. 563, 568 (1986). Defendant failed to include laches as an affirmative defense in its April 30, 2001 answer. However, this court has allowed the defense of laches to be raised upon a motion to dismiss or a motion for summary judgment, despite a party's failure to affirmatively raise the defense in its answer, in light of the liberal policy of the Federal Rules of Civil Procedure, upon which this court's rules are based. *Dean,* 10 Cl.Ct at 568 n. 10; *see also Al–Kurdi v. United States,* 25 Cl.Ct. 599, 604 (1992).[10]

In order to successfully bar a plaintiff's claim based on the doctrine of laches, the proponent of the defense must show

---

**10.** For a more detailed discussion of waiver of affirmative defenses in this court, see discussion *infra* pp. 448–49.

(1) that plaintiff unreasonably delayed in asserting its cause of action, and (2) that plaintiff's delay resulted in prejudice to defendant. *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed.Cir. 1992); *Conner v. United States*, 10 Cl.Ct. 110, 112 (1986). The burden of establishing inexcusable delay *and* prejudice is on the proponent and failure to prove both elements is fatal to the establishment of laches. *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961).

 Defendant argues that the City should be precluded from asserting its compensable takings claim because the Easement was issued twenty-four years ago and, accordingly, if the City rejected the terms of the Easement (in particular, the hold harmless language that defendant argues bars the City's takings claim), then the City should have objected to the easement language at the time of issuance, and not twenty-four years later.

With respect to defendant's laches argument, defendant has not shown that plaintiff unreasonably delayed in asserting its cause of action. The cause of action in this matter is the alleged taking of the City's water transmission system resulting from defendant's conduct of lowering and raising water levels, allegedly causing landslides and damage to the City's water transmission system. Defendant has not argued any delay or prejudice with respect to when plaintiff opted to bring its lawsuit; in this instance, in the year 2000, five years after the first signs of damage. Without evidencing that plaintiff unreasonably delayed in bringing its takings claim, or any prejudice stemming from such delay, defendant's laches defense fails.

The lengthy delay of which defendant complains does not regard the timing of plaintiff's lawsuit, but, rather, the time that has lapsed between when the Easement was issued (or at least received by the City) and plaintiff's challenge to its validity. This argument more appropriately describes an assertion of equitable estoppel, as opposed to laches. The applicability of the doctrine of equitable estoppel to this matter is discussed in much further detail below.

## B. Substantive Arguments

### 1. Applicability of the Easement's Release Clause

#### a. The City's Challenge of the Validity of the Easement

Having satisfied the jurisdictional requisites for this court to entertain this matter, the court must now address the substantive issue as to whether the release language contained in the Easement bars the City's claim. According to defendant, paragraph 7 of the Easement contains the following language:

> The United States shall not be responsible for damages to property or injury to persons which may arise from or be incident to the use and occupation of the said premises, nor for damages to the property of the grantee, nor for damages to the property or injuries to the person of the grantee's officers, agents, servants, or employees, or others who may be on said premises at their invitation or the invitation of any one of them, arising from or incident to government activities, and the grantee shall hold the United States harmless from any and all such claims.

Def.'s Ex. 26 at 64.

Defendant asserts that the release language in the Easement precludes plaintiff's takings suit because the language shields the government from all liability. Plaintiff counterargues that this language does not preclude lawsuit because defendant has not shown that the City agreed to the terms of the release.

 In general, a release will operate to discharge the government from all claims arising under the applicable agreement. *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1203 (Fed.Cir.1994) (finding that because a valid release was executed, plaintiff's claim for contract damages was barred); *Kenbridge Construction Co. v. United States*, 28 Fed.Cl. 762, 765 (1993) (citations omitted). "A release may ... preclude the later assertion of a takings claim when 'circumstance[s] indicat[e] that a release of a takings claim had been contemplated and bargained for.'" *Henderson County Drainage District No. 3*

v. United States, 60 Fed.Cl. 748, 752 (2004) (citing Henderson County Drainage District No. 3 v. United States, 55 Fed.Cl. 334, 343 (2003) (Henderson II)). In the case of government contracts, a contractor's execution of a release that is complete on its face reflects the contractor's unqualified acceptance and agreement with its terms and is binding on both parties. Kenbridge Construction, 28 Fed.Cl. at 765 (citing B.D. Click Co. v. United States, 222 Ct.Cl. 290, 614 F.2d 748, 756 (1980)). However, also in the case of government contracts, there are special and limited circumstances under which a claim may be prosecuted despite the execution of a release. Id. (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1395 (Fed.Cir.1987)). These include mutual mistake, conduct of the parties acknowledging claims after a release, obvious mistake or oversight, and fraud or duress. Id.

■ In interpreting a release, the court must first ascertain whether the language clearly bars the asserted claim. King v. Dept. of the Navy, 130 F.3d 1031, 1033 (Fed.Cir.1997), aff'd after remand, 178 F.3d 1313 (Fed.Cir.1999) (table). If the provisions are clear and unambiguous, they must be given their plain and ordinary meaning. McAbee Construction, 97 F.3d at 1435; Alaska Lumber & Pulp. Co., Inc. v. Madigan, 2 F.3d 389, 392 (Fed.Cir.1993). The parol evidence rule forbids the admission of additional evidence when language of an easement is complete and unambiguous, and when there is no contention that the easement was executed as a result of fraud, accident or mistake. McAbee Construction, 97 F.3d at 1435 (finding no ambiguity in easement language expressly permitting the Corps to deposit and fill waste on plaintiff's land and to perform any other work necessary and incident to the Corps' dam replacement project).

For example, in Bistline v. United States, the Court of Claims found that the release clause in an easement barred plaintiffs' claim for inverse condemnation. Bistline v. United States, 226 Ct.Cl. 282, 640 F.2d 1270, 1274 (1981). There, plaintiffs claimed that the construction and operation of the Albeni Falls Dam project by the Corps caused their property to wash away and erode. In particular, the taking of plaintiffs' property occurred when adverse storm winds, coupled with project waters, cut away the banks of plaintiffs' land above the limits of the flowage easement held by the government and washed portions of their property into the reservoir maintained by the Corps. The flowage easement contained a clause releasing the government from damages by reason of the overflow of water caused by the construction and operation of the Albeni Falls project. The court there found that the release barred plaintiffs' takings claim. Id. at 1275. The affidavits presented demonstrated that the amount paid for the easements, approximately $20,000, was to compensate owners for the actual flooding and taking of land lying below an elevation of 2062.5 feet. In addition, the court found that the language in the easement granted the government the perpetual right to intermittently overflow, flood and submerge all of the subject land lying above and below the 2062.5 elevation mark. Id. at 1274. The release clause did not specify that the right to the intermittent flooding of the land was limited to a specific contour elevation. Id. The general release language relieved the government from "all claims and damages that have accrued or may hereafter accrue to any or all of the above described lands by reason of the overflow of water occasioned by the construction and operation" of the project. Id. The court found this language to completely and unambiguously bar plaintiffs' claim.

■ If a release is ambiguous as to the scope of its coverage, the court will construe the language to effect the parties' intent at the time they executed the release and allow the introduction of parol evidence to determine that intent. Cray Research, Inc. v. United States, 41 Fed.Cl. 427, 436 (1998) ("If a written contract is unclear, or not integrated, prior or contemporaneous extrinsic evidence that does not contradict the written language of the contract may be introduced to establish its meaning."); see also Dureiko v. United States, 209 F.3d at 1345, 1356 (Fed.Cir.2000) (finding the phrase "demolition and removal" contained in a release to be ambiguous since the phrase could refer to

the government's removal of debris pertaining to the removal of mobile homes, or the removal of *any* debris). For example, in *Henderson County Drainage District No. 3,* 60 Fed.Cl. at 750, the Corps built a nine-foot Navigation Project in the Upper Mississippi River. In order to support commercial river traffic, the Corps maintained a nine-foot channel depth using a series of locks and dams to control pool levels. During high-water flow conditions and flood events, the lock and dam controls were taken out of operation, and the river ran in its natural state. From the late 1930's until the 1950's, the United States made annual payments to fifteen drainage districts for additional pumping costs incurred by the drainage districts due to the high river stages caused by the project. Congress authorized payments to the drainage districts in exchange for releases waiving future claims arising out of the operation and maintenance of the Navigation Project. Plaintiffs filed a takings claim asserting that the operation of the Navigation Project by the Corps caused excess seepage from the Mississippi River. This, plaintiffs alleged, triggered additional pumping costs within the drainage districts and left the Henderson County levee severely eroded. *Id.* at 751. The government argued that the takings claim was barred by the releases. However, the court found that the releases did not bar plaintiffs' takings claim because there was no specific language explicitly stating that plaintiffs' takings claims were barred. *Id.* The ambiguity of the release's scope of coverage forced the court, in the absence of evidence of the parties' mutual intent, to construe the language against the drafter. *Id.* at 757.

 Because plaintiff is challenging its assent to the terms of the Easement, the court must address whether a valid easement was assented to by the parties in this case. Acceptance requires a manifestation of assent to the terms made by the offeree in a manner invited or required by an offeror. *Anderson v. United States,* 344 F.3d 1343, 1355 (Fed.Cir.2003) (for acceptance to occur, there must be a manifestation of an intent to agree to the terms offered, such as, in the case of *Winstar*-related claims, documents containing statements evidencing the government's promise to permit the amortization of goodwill) (citing Restatement (Second) of Contracts § 18 (1981)). Generally, "[a] person's signature on a written instrument normally indicates assent to the terms of that document." *Nicholson v. United States,* 29 Fed.Cl. 180, 188 (1993) (in the context of debt instruments—finding valid debt agreement was created, even though plaintiff asserted that she never acceded to the placement of certain property as collateral, since plaintiff's signature on agreement unequivocally showed assent to terms of the debt agreement); *Carpenter v. United States,* 4 Cl.Ct. 705, 714 (1984) (in the context of trust agreements—finding that signature on trust created valid trust agreement since agreement expressly declared intent to create a trust and convey interest) (citing *Rossi v. Douglas,* 203 Md. 190, 199, 100 A.2d 3, 7 (1953)).

Defendant contends that the City assented to the terms of the Easement when, on January 30, 1978, Mayor Klein executed an Assurance of Compliance Under Title VI of the Civil Rights Act of 1964, which purportedly was Exhibit C of the Easement. It is not explicitly clear from the Easement language whether the City's signature on the Assurance demonstrated assent to the terms of the Easement. In other words, it is not clear that the Easement, combined with the Assurance, constitutes one complete, integrated document, especially in light of the fact that (1) the Assurance was signed in 1978, five years after the first easement was drafted, and (2) the Assurance refers to the unrelated issue of civil rights.

 Parol evidence is admissible to show the extent to which a written agreement is integrated. *McAbee Construction,* 97 F.3d at 1434 (citations omitted); *Sylvania Electric Products, Inc. v. United States,* 198 Ct.Cl. 106, 458 F.2d 994, 1006 (1972); *Coggeshall Development Corp. v. United States,* 29 Fed.Cl. 264, 269 (1993) (the court may consider both the document itself and extrinsic evidence to determine whether parties intended for the deed to be a final, integrated document). A fully integrated writing is one where the parties have agreed that all of the terms and conditions were expressly con-

tained within the four corners of the document itself. *McAbee*, 97 F.3d at 1434. In *McAbee*, the court found that the United States made no representation or promise that was not already expressly contained in the easement at issue. *Id.* The plaintiff thus carried an extremely heavy burden in overcoming that attestation to the document's finality and completeness. *Id.*

 Defendant has an extremely heavy burden to overcome here as well. As far as integration of the Assurance with the Easement, defendant has not demonstrated that the Assurance was integrated with the Easement in such a way that the City's assent to the terms of the Assurance would also represent its assent to the terms of the Easement. Neither party has demonstrated that the Assurance was integrated into the Easement. The Easement contains no references to any external documents or agreements. *See United States v. Winstar*, 518 U.S. 839, 860–70, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (for a discussion on integration). The execution of the Assurance does not validate the Easement without proof of that intent, which is lacking here.

Finding that the City's signature on the Assurance does not constitute acceptance of the terms of the Easement, the next inquiry for the court is to determine whether the City should be estopped from asserting that the release language is inapplicable. The court is of the opinion that the facts and contentions which the government has set forth in its pleadings to raise an affirmative defense of laches are just as, if not more so, appropriately characterized as equitable estoppel. The government's reply and opposition to plaintiff's motion for summary judg-

ment, while characterizing its affirmative defense as "laches", set forth the basic foundation for an assertion of equitable estoppel when it stated:

> Here, the City failed to come forward in a timely fashion after it received the easement in 1978 and assert that it did not agree to the hold harmless clause. Instead, the City stayed silent for 24 years .... Here the doctrine of laches must be found to bar the City's assertion at this late date that it did not agree to the terms of the easement.... In any case, its effort to disclaim the easement some 24 years after the fact, and mount a collateral attack on the terms of the easement, should be rejected.

Def.'s Reply on its Mot. to Dismiss at 7–8. Thus, the court believes that the facts upon which the government asserts a laches defense are appropriately characterized as equitable estoppel, and the pertinent inquiry is whether the City is estopped from asserting that it did not agree to the terms of the Easement.

 As was the case with defendant's laches defense, the government did not originally raise the defense of estoppel and this defense is generally waived if not raised in defendant's answer.[11] *See Crocker v. United States*, 130 Ct.Cl. 567, 127 F.Supp. 568, 573 (1955); RCFC 8(c). In other words, it must be affirmatively plead by defendant or else it is deemed to be waived. *Id.* However, the court has the power to the raise issues *sua sponte* when it is in judicial interest to do so. *See Orlando Helicopter Airways, Inc. v. Widnall*, 51 F.3d 258, 260 (Fed.Cir.1995) (the court has power to raise jurisdictional issues

11. The court observes that the manner in which this case has evolved did not lend itself to the assertion of the affirmative defense of laches or equitable estoppel in the government's answer. In the first place, the complaint made no mention of any easement, but rather simply stated that the City constructed a water supply system in the Reservoir and that defendant's operation of the Dam and Reservoir caused such severe damage to the pipeline system as to constitute a taking. In its answer, defendant set forth the following as one of its "Affirmative Defenses":

> In an easement granted by defendant to plaintiff which enabled plaintiff, in whole or in part, to construct, maintain, and operate the water

facilities alleged in plaintiff's complaint, plaintiff agreed that the United States shall not be responsible for any property damage to plaintiff's property and that plaintiff will hold the United States harmless for any claim of damage.

Def.'s Answer p. 2, ¶ 1. Not until plaintiff filed its brief in opposition to the government's motion to dismiss and motion for summary judgment was any challenge made by plaintiff to the validity of the Corps' Easement. Thus, the first occasion that the government would have had to assert the affirmative defense of equitable estoppel would have been well after defendant's answer was filed.

*sua sponte*); *Hermes Consolidated, Inc. v. United States,* 58 Fed.Cl. 3, 20 n. 21 (2003) (court may raise affirmative defense of laches *sua sponte*); *Southern Cal. Fed. Savings & Loan Assoc. v. United States,* 52 Fed.Cl. 444, 452 (2002) (court may raise jurisdictional issues, such as statute of limitations, *sua sponte*); *Diliberti v. United States,* 2 Cl.Ct. 404, 409 (1983) ("A judge may dismiss a suit *sua sponte* ... in order to achieve orderly and expeditious disposition of cases.") (citing *Lopez v. Aransas County Independent School District,* 570 F.2d 541 (5th Cir.1978)); *see also* RCFC 41(b).

▆ Furthermore, the purpose of Rule 8(c) is simply to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that the party is prepared to properly litigate it. *Al–Kurdi,* 25 Cl.Ct. at 604 (citing *Hassan v. United States Postal Service,* 842 F.2d 260, 263 (11th Cir.1988)). Failure to plead an affirmative defense does not automatically extinguish the defense. *See Cities Serv. Helex, Inc. v. United States,* 211 Ct.Cl. 222, 543 F.2d 1306, 1313 n. 14 (1976). In general, a court may allow a non-plead affirmative defense to be raised if it would not result in prejudice to the party. *See id.* (finding that "since the plaintiffs have ably and thoroughly responded to the Government's arguments, showing no prejudice from the injection of the issue at this stage, and all parties have exhaustively treated it, we will consider the defense on the merits").

▆ In this instance, no prejudice has resulted with respect to the inquiry as to whether the defense of equitable estoppel applies to bar plaintiff's claim since the court has given both parties a full opportunity to adequately brief the issue per this court's December 22, 2004 order.[12] *See Al–Kurdi,* 25 Cl.Ct. at 604 ("Plaintiff was not prejudiced by defendant's failure to assert the affirmative defense of statute of frauds [since] [p]laintiff has adequately argued against defendant's motion for summary judgment.").

The court does not deem that further discovery would be needed as to this issue.

▆ "It has long been a standing principle in this court that the conduct and admissions of a party operate against him in the nature of an estoppel when the other party detrimentally relies upon that conduct of those admissions." *Weir v. United States,* 200 Ct.Cl. 501, 474 F.2d 617, 622 (1973) (citing *Mahoning Investment Co. v. United States,* 78 Ct.Cl. 231, 3 F.Supp. 622, 629 (1933), *cert. denied,* 291 U.S. 675, 54 S.Ct. 526, 527, 78 L.Ed. 1064 (1934)). The doctrine of equitable estoppel bars a party from raising a defense or an objection it otherwise would have. *Biagioli v. United States,* 2 Cl.Ct. 304, 307 (1983) (quoting *Jablon v. United States,* 657 F.2d 1064, 1068 (9th Cir. 1981)). The affirmative defense of equitable estoppel requires that the asserting party had reasonably relied upon the conduct of the estopped party. *Henry v. United States,* 870 F.2d 634, 636–37 (Fed.Cir.1989). The elements of equitable estoppel are: (1) misleading conduct, which may include not only statements and action but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted. *Lincoln Logs Ltd.,* 971 F.2d at 734; *see also A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1041 (Fed.Cir.1992) (stating that this formulation of the three elements of equitable estoppel "reflects a reasonable and fairly complete distillation from the case law"). An explicit representation is not a necessary precondition for a finding of equitable estoppel. *Hercules Inc. v. United States,* 49 Fed.Cl. 80, 88 (2001), *aff'd,* 292 F.3d 1378 (Fed.Cir.2002). Estoppel can lie for a course of conduct, without misrepresentation, by the estopped party. *Id.* " 'This latter view is in accord with those cases that hold that a party who engages in a course of conduct, even without misrepresentation, upon which another party has a right to believe he is intended to act or upon which

---

12. The court also requested that the parties brief the issue as to whether the doctrine of ratification would apply to bar plaintiff's claim. Having reviewed the parties' submissions to the court on this particular issue, the court concurs with the parties and finds the doctrine of ratification inapplicable to this matter.

the first party intends him to act, will be estopped from repudiating the effect of such conduct.'" *Id.* (citing *Emeco Indus., Inc. v. United States,* 202 Ct.Cl. 1006, 485 F.2d 652, 657 (1973)).

In another arena, in *Salla v. United States,* the Court of Claims considered the doctrine of estoppel with respect to a claim for civilian pay. 228 Ct.Cl. 744 (1981). There, plaintiff claimed that he performed the duties of a GS–15 position while being classified and paid at a GS–14 level while serving as a program officer. The Court of Claims found that because the plaintiff was never appointed to a GS–15 position as program officer, his performance of GS–15 duties did not entitle him to receive the salary of GS–15. *Id.* at 746. The court also found that plaintiff was estopped from attacking the legality of a constructive detail as a GS–15 since he willingly served as a program officer. "Having accepted the benefits of the detail [one such benefit was the retention of his prospects for promotion], plaintiff is now estopped to attack its legality." *Id.* at 747; *see also Peters v. United States,* 208 Ct.Cl. 373, 534 F.2d 232, 235 (1975) (plaintiff was estopped from attacking legality of detail as acting Deputy General Counsel at the Federal Aviation Administration, allegedly entitling plaintiff to higher pay, since plaintiff was never officially appointed to the position and he accepted benefits from the detail for over two years without complaint).

In this instance, despite the fact that plaintiff did not sign the Easement and alleges that it did not agree to its terms, the court finds that plaintiff should be estopped from asserting that the release from liability language contained in the Easement does not apply. The documents produced by the parties demonstrate that on July 25, 1973, the Corps forwarded the City a proposed easement granting the City a right-of-access across the Corps' land. Although, the City did not receive a final easement based on this proposal, it commenced construction of the water transmission system in 1973 and completed construction in mid–1975. The City clearly knew that it did not have a fully executed easement, evidenced by the fact that it wrote to the Corps a number of times

demanding a copy of the final, signed easement; yet it, nonetheless, commenced with construction of the water intake system. The Corps formally issued the Easement on March 7, 1978, which plaintiff acknowledged receiving on October 16, 1978, three years after the City had completed construction of the water system. Although the City did not sign the Easement and did not specifically acknowledge acceptance of its specific terms via a signature, the court finds that the construction and continued operation of the water intake structure precludes the City from asserting that it never consented to the terms of the Easement. This is especially true in light of the fact the City additionally sought a permit and license for the construction and, most importantly, transported water from the Reservoir until 1997 when the City abandoned the water transmission system.

In reviewing the factors necessary to prove equitable estoppel, the court finds, with respect to the first factor identified (misleading conduct), the government was misled by the City's silence regarding its acceptance of the terms of the Easement. Because the City did not inform the Corps of its disapproval of the Easement's terms, the Corps had no knowledge nor any reason to be aware that the City would challenge acceptance of the Easement at a later date. With respect to the second factor (reliance upon the conduct), the government clearly relied upon the City's silence. The City must have intended that the Easement would be honored by the Corps once it built its water intake system, or else the City's structures would have been illegally situated in the Reservoir. *See 5.96 Acres of Land,* 593 F.2d at 888. The government had no reason to suspect that the City would unexpectedly, decades after the water intake system was built and had been used by the City without challenge, assert that the it did not assent to the terms of the Easement. Finally, with respect to the third factor (material prejudice), the government would be prejudiced and injured if plaintiff were allowed now, decades after the Easement was issued, to declare the Easement unenforceable against it. The government is harmed by the fact that the City challenges the terms of the

Easement, decades after the water intake system was built and utilized, through the filing of this lawsuit for damage claims exceeding $1,000,000 due to be paid by the government. In view of the foregoing, defendant has demonstrated that all factors necessary to establish equitable estoppel have been met.

 Accordingly, because plaintiff is estopped from arguing that it is not bound by the terms of the Easement because it never signed the Easement, the court finds that the hold harmless language contained in the Easement applies to plaintiff. The hold harmless provisions of the Easement contain unequivocal language that specifically precludes the government's liability for damages claimed here. As previously discussed, the Easement states that "[t]he United States shall not be responsible for damages to property ... which may arise from or be incident to the use and occupation of the said premises [13], nor for damages to the property of the grantee, ... arising from or incident to government activities, and the grantee shall hold the United States harmless from any and all such claims." Def.'s Ex. 26 at 64. This unequivocal language is broad enough in scope to include any and all damages arising from the government's authorized operation of the Oahe Dam and Reservoir. Since the Easement precludes recovery for damages to the City's property arising from the City's occupation of the premises, as well as those arising from or incident to government activities, plaintiff's claim is barred with respect to damage to all structures claimed, whether residing in the waters of the United States or on adjacent property.

### b. The City's Adhesion Contract Argument

In addition to challenging the validity of the Easement, the City also alleges that the Easement is void as an unconscionable adhesion contract. In particular, the City claims that the Easement was a form unilaterally

drafted by the Corps and presented to the City on a take-it-or-leave-it basis. The City claims that the correspondence between the parties shows that the City had no input into the terms of the Easement and that no negotiation occurred between the parties. The City alleges that the Corps held all of the bargaining power in the transaction and that if the City had objected to the release language in the Easement, the Corps would not have granted the City the necessary Easement.

As a preliminary matter, the court again observes that if there had been no valid Easement, then the City's water system would have been trespassing on property of the United States. *See 5.96 Acres of Land,* 593 F.2d at 888. The structures would therefore have been unlawful, thus undermining the City's entire takings claim. *Id.* It is a *non sequitur* for the City to assert on the one hand that the Easement validly permitted the City to operate and maintain structures on the Reservoir bed, but then argue that the Easement was an unconscionable adhesion contract, without effect. The City is attempting to manipulate the facts herein to serve both its purposes—proving that compensable damage occurred to structures that the Easement permitted to be built and utilized, but then negating the validity of that very same Easement with the argument that the Easement constituted an adhesion contract that should not be upheld. The two contentions, however, are incompatible and cannot functionally co-exist.

 Plaintiff's argument in this regard is ill-founded and the City has not offered sufficient evidence that the Easement was a contract of adhesion. An adhesion contract is a form of contract unilaterally drafted by one party and presented to the other party on a "take-it-or-leave-it" basis. *Nebco & Assocs. v. United States,* 23 Cl.Ct. 635, 645 (1991) (citing Colorado law). In *Nebco,* the Claims Court found that the contract at issue there,

---

13. The "said premises" referred to in the Easement was described in that document as land under the control of the Secretary of the Army, the exact parameters of which were set forth in drawings accompanying and made a part of the Easement. Def.'s Ex. 26 at 63. The "govern-

ment activity" referred to and included the Corps' raising and lowering of the water levels of the Reservoir, which this court has already determined to have been a legitimate governmental activity.

an agreement with the Small Business Administration, did not constitute a contract of adhesion when plaintiff did not show (1) a great disparity in the parties' bargaining power; (2) that plaintiff was not given an opportunity for input or negotiation; and (3) in that instance, that plaintiff could not have obtained adequate property elsewhere. *Id.* The plaintiff in *Nebco* offered no proof or evidence that it had inadequate bargaining power. In fact, the court found that the plaintiff there was in the business of buying and selling real estate, and the plaintiff itself had established the contract price. *See also Seaboard Lumber Co. v. United States,* 903 F.2d 1560, 1565–66 (Fed.Cir.1990) (the bare fact that a government contract is on a "take-it-or-leave-it" basis does not necessarily constitute a contract of adhesion so as to invalidate a contract's provision waiving the right to a jury trial since the private party was not compelled or coerced into making a contract with the government and that party voluntarily entered into the contract), *cert denied,* 499 U.S. 919, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991); *National By–Products, Inc. v. United States,* 186 Ct.Cl. 546, 405 F.2d 1256, 1267 (1969) (finding no uneven bargaining power or overreaching by the government with respect to an informal agreement to construct a levee since contract was a result of mutual drafting and that document was a type common to private land transactions, rather than unique to government practice). *But see Sandnes' Sons, Inc. v. United States,* 199 Ct.Cl. 107, 462 F.2d 1388, 1392 (1972) (stating that there is presumption against waiver of constitutional rights with respect to government contracts, since government contracts tend to be ones of adhesion—in the issue of whether plaintiff voluntarily entered into contracts subject to the Renegotiation Act).[14]

■ Here, plaintiff contends that the Easement was an adhesion contract, but offers scant evidence to support its position. Although the Easement was presented on a take-it-or-leave-it basis, as suggested in an August 1, 1997 letter sent by the Corps in anticipation of litigation indicating that the release language was boilerplate, this fact alone is not enough to support a claim of adhesion. The court in *Nebco* stated that:

> Even had the contract been offered on a "take-it-or-leave-it" basis, plaintiff would need to show more to prove adhesion. First, plaintiff must show a great disparity in the parties' bargaining power. Second, plaintiff must show that it was not given an opportunity for input or negotiation. Finally plaintiff must show that it could not have obtained adequate property elsewhere.

*Nebco,* 23 Cl.Ct. at 645. In this instance, while the court finds that there was a disparity in the bargaining power of the parties, with the government, of course, being in a much more powerful position,[15] the court does not find that the last two conditions necessary to establish an adhesion contract fall in plaintiff's favor. Plaintiff also has not shown that it was not given an opportunity for input or negotiation. The evidence indicates that the City had ample input into the terms of the Easement. On July 20, 1973, the Corps sent Mayor Klein a proposed easement which he was asked to review and

---

14. However, Chief Judge Cowen found, in his separate opinion, that since plaintiff voluntarily entered into renegotiable contracts, was charged with knowledge of their terms, and received benefit from the contracts, the contracts were not ones of adhesion, even if fully drafted by the government and plaintiff had no opportunity to object to provisions, since plaintiff was under no obligation to do business with the government. 462 F.2d at 1396. By entering into the contracts, plaintiff waived its right to challenge, on due process grounds, the renegotiation procedures referenced in its contracts voluntarily executed by plaintiff, especially since, Chief Judge Cowen found, the provision imposed was in furtherance of an important governmental policy. *Id.* at 1397.

15. As indicated in the numerous pieces of correspondence back and forth between the City and the Corps, the Corps was required to and did, in fact, follow strict regulations in the processing and approval of the City's requests for the license, permit and easement. Inasmuch as the Corps' role in this process was relegated primarily to ensuring that both parties were in compliance with federal regulations which controlled how, when and under what circumstances easements (as well as licenses and permits) could be issued to local municipalities, the existence of this strict regulatory scheme superimposed strict controls which, on a practical level, severely limited the Corps' ability to wield discretionary power.

indicate whether the City approved. In an August 28, 1973 letter to the Corps, Mayor Klein stated that the City of Gettysburg agreed with the terms and conditions contained in that iteration of the proposed easement. In none of the correspondence produced by the parties is it shown that the City was ever denied an opportunity to negotiate the terms of the Easement to address specific concerns the City might have had. Plaintiff also has not shown that it could not have obtained water elsewhere. Actually, the record before the court reflects that plaintiff had alternative water sources available to it at the time that it was conducting its studies into potential ground water sources. A study conducted by J.D. Beffort indicated at least three possible areas that would have qualified as potential sources for ground water. Pl.'s Brief in Opp. to Def.'s Mot. to Dismiss at Tab 1, Ex. A at 1,12. The City was not forced to utilize the Reservoir as its only possible source for water.

In further contradiction to plaintiff's allegation of an adhesion contract, the court observes that the United States has the power to place reasonable conditions on the use of its property in the same manner as a private property owner may condition the use of his real or personal property, although, unlike a private individual, government actions must go a step further and must also reasonably further a valid public purpose. *See 5.96 Acres of Land,* 593 F.2d at 890 (citations omitted). The *5.96 Acres of Land* court, in citing *Boston Edison Co. v. Great Lakes Dredge & Dock Co.,* 423 F.2d 891 (1st Cir.1970), discussed that a release clause contained in a permit was not against public policy (as a result of the parties' unequal bargaining power) since the insertion of the clause was allowable under the Secretary of the Army's discretion under 33 U.S.C. § 1.[16] The *Boston Edison Court* noted that if the release from liability clause was thought to be against public policy, then Congress, through legislation, could enunciate that policy. 423 F.2d at 897. Thus, the *5.96 Acres of*

*Land* court held that the condition at issue there, exculpatory clauses contained in a permit, simply placed upon the permittee the risk of damage to the permitted structure. 593 F.2d at 890. The court found such a clause to be valid when the United States is discharging its special duties and responsibilities over navigable waters. *Id.* Furthermore, the *5.96 Acres of Land* court noted that the damage that occurred therein was an unavoidable consequence of a project undertaken to further the public good—that being the Corps' construction of the Bonneville Dam's powerhouse project. Thus, the court noted, the policy supporting insulating the government from liability was a strong one. *Id.* at 891.

In this instance, it is undisputed that the Corps' operation of the Oahe Dam was for the public good and in the public interest. *See* Flood Control Act of 1944, Pub.L. No. 534, 58 Stat. 887–88 (codified as amended in scattered sections of 33 U.S.C. §§ 701–1, *et seq.* (1952)). The Corps raised and lowered water levels in the dam for the purpose of flood control and for maintaining adequate water supplies. *See* discussion *supra* Section II.A.1. Furthermore, the Corps is vested with the power to grant easements for right-of-ways for water pipelines provided that such grants will be in the public interest. *See* 10 U.S.C. § 2669; 33 C.F.R. §§ 211.6, 320.1 (2004). There is no indication that the Easement, with the included release from liability clause, was beyond the scope of the Corps' authority, and no support for plaintiff's contention that the Easement created a contract of adhesion between the government and the city.

## 2. Applicability of the License's Release Clause

The parties do not spend a considerable amount of time discussing whether the release language contained in the License ap-

---

16. That provision states:

It shall be the duty of the Secretary of the Army to prescribe such regulations for the use, administration, and navigation of the navigable waters of the United States as in his judgment the public necessity may require for the protection of life and property, or of operations of the United States in channel improvement ....
33 U.S.C. § 1.

plies in this matter.[17] The License specifically granted the City a two-year license to create a temporary construction area for the construction and installation of the water transmission system. The License authorized the City to occupy the above-referenced government property on the shores of the Reservoir as a construction site for the water intake structure and pumping station. Whereas the Easement gives the City the right to maintain the pipeline and pumping station on land owned by the government, the License simply allowed the City to occupy government land adjacent to the Reservoir to facilitate construction of the system.

The only issue the parties have addressed with respect to the License is whether the City assented to the terms of the License. However, assuming there exists a valid instrument, the parties fail to discuss whether the hold harmless language in the License limits the government's liability in this matter. Irrespective of whether the parties agreed to the terms of the License, the court finds that the License is inapplicable to determining the instant motion. The License was for a two-year, limited term which expired well before the alleged damage to plaintiff's water intake system. Thus, to the extent that the hold harmless language would apply in the given matter, it would only have applied during the term of the License. Accordingly, the court finds that the License is not pertinent to determining the government's liability for plaintiff's alleged damages.

### 3. Applicability of the Permit's Release Clause

■ This court has already addressed whether the Permit affords the City a suffi-

cient cognizable property interest to assert its takings claim. *See* discussion *supra* Sec. II.A.1. Thus, the issue now to be determined is whether the release language in the Permit bars the City's claims. The validity and execution of the Permit is not challenged by the parties. The parties agree that a Section 10 Permit was signed by Mayor Klein on November 14, 1973. Paragraph (j) of the Permit provides:

> That the United States shall in no way be liable for any damage to any structure or work authorized herein which may be caused by or result from future operations undertaken by the Government in the public interest.

Def.'s Ex. 10 at 36. The term "public interest" is broadly defined in the Permit as including, but not limited to, a consideration of the following factors: navigation, fish and wildlife, water quality, economics, conservation, aesthetics, recreation, water supply, flood damage, prevention, ecosystems, and, in general, the needs and welfare of the people.[18] *Id.* at 39.

Defendant argues that this language expressly precludes any lawsuit against the government because the clause places upon the City, not the United States, the risk of damage to the permitted structures resulting from activities of the United States taken in the public interest. Defendant argues that because plaintiff alleges that the landslides damaging the water transmission system were caused by the Corps' "construction, management and operation of the Oahe Dam," the City has waived its ability to assert the cause of action against the government as set forth in the complaint. Defendant further argues that because the government's action of raising and lowering the water levels in the Reservoir was a legiti-

---

17. This clause states:

> That the United States shall not be responsible for damages to property or injuries to persons which may arise from or be incident to the exercise of the privileges herein granted, or for damages to the property of the licensee, or for injuries to the person of the licensee, or for damages to the property or injuries to the person of the licensee's officers, agents, servants, or employees, or others who may be on said premises at their invitation or the invitation of any one of them, arising from or incident to governmental activities on the said

premises, and the licensee shall hold the United States harmless from any and all such claims.

Def.'s Ex. 27 ¶ 4.

18. The court finds that the term "public interest" includes the Corps' operation of the Reservoir, including the raising and lowering of water levels for flood control and water supply purposes. This court has already determined that the Corps' operation of the Oahe Dam was in the public interest. *See* discussion *supra* Sec. II.A.1.

mate government action, and legitimately for a public purpose, then the above-quoted release language specifically precludes suit.

Plaintiff, on the other hand, argues that the Permit only precludes liability for damage "to any structure or work authorized" by the Permit. Def.'s Ex. 10 at 36. The only structure, the City contends, authorized by the Permit was "laying an intake line and constructing a pumphouse." *Id.* Accordingly, plaintiff claims that the release applies only to damage to the intake structure and the pumphouse. It does not account for damage to the water transmission pipeline not under the scope of the Permit.[19] Def.'s Ex. 10 at 40.

The Permit specifies exactly what work was authorized to be conducted by that instrument. The Section 10 Permit specifically authorized the City to:

[C]onstruct and maintain a water intake structure approximately 14 miles west and 1½ miles north of Gettysburg, South Dakota, and approximately 1½ miles up the Cheyenne Creek arm of Lake Oahe from Missouri River mile 1152.5 (1960 mileage). The work is to consist of laying an intake line and constructing a pumphouse. A 12–inch casing is to be placed from the intake opening in the reservoir through a bored shaft initiating in the reservoir at an elevation of 1553', rising up a slope, through a knoll, and to a pumphouse. The elevation of the pumphouse is to be approximately 1625 feet. The water intake system is to be provided with screens with mesh openings of not more than .14" and approach velocity of not more than .5 feet per second immediately in front of the screens. All areas disturbed by construction are to be returned to natural grade and reseeded[.]

Def.'s Ex. 10 at 35.

The court finds the above-quoted language to be unambiguous. The plain meaning of the clause "structure or work authorized herein" is the construction of the water intake structure and the pumphouse, and the laying of an intake line, as described above. Def.'s Ex. 18 at 51. The Permit authorized

the City to construct and operate these three items. The Permit does not suggest that any other structure or work be accomplished by virtue of the grant of the Permit. The Permit very clearly states that it authorizes the City to "construct and maintain a water intake structure" and conduct "work ... consist[ing] of laying an intake line and constructing a pumphouse." Def.'s Ex. 10 at 34. There is nothing ambiguous in this language. It is clear that the water intake structure was the structure exiting the Reservoir and connected to the pumphouse on the east bank of the Reservoir. The release clause unequivocally releases the government from liability for damages to the water intake structure, the pumphouse and the intake line that occurred as a result from the operation of the Reservoir. Accordingly, the court finds, based on the unambiguous plain language of the Permit, that the City's claim is denied with respect to damage to structures identified in the Permit.

With respect to any additional structures not falling under the ambit of the Permit, such as the water pipelines located on non-government owned land leading from the water treatment facility towards the City beyond the pumphouse, those structures fall under the release language of the Easement and, as previously discussed, recovery for that damage is precluded. *See* discussion *supra* Sec.II.B.1.a. Accordingly, finding that the release language contained in both the Permit and the Easement unambiguously limits recovery for damage to the water intake system, plaintiff's claim fails.

## CONCLUSION

For the following reasons, it is hereby **ORDERED** as follows:

(1) Defendant's Motion to Dismiss Complaint For Failure To State A Claim Or In The Alternative For Summary Judgment, filed September 6, 2002, is **GRANTED.**

19. In fact, the City's takings claim is solely for damage to that part of the underground transmission pipeline running east from the pumphouse up the Reservoir slope. Pl.'s Statement of Uncontroverted Fact ¶¶ 43–44.

(2) The Clerk's office is **DIRECTED** to **ENTER** judgment for defendant, dismissing plaintiff's complaint; and

(3) Each party shall bear its own costs.